**Leta E. Gorman**, OSB # 984015
E-mail:  leta.gorman@jordanramis.com
**Diane Lenkowsky**, OSB # 143725
E-mail:  diane.lenkowsky@jordanramis.com
JORDAN RAMIS PC
Attorneys at Law
Two Centerpointe Dr 6th Flr
Lake Oswego OR 97035
Telephone:  (503) 598-7070
        Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| TAISSA AND RAY ACHCAR-WiNKELS, **individually and as Parents and Next Friends of S.A., a minor**, | Case No. 3:15-cv-00385-ST |
| Plaintiffs, | THIRD AMENDED COMPLAINT 28 USC § 1331 DEMAND FOR JURY TRIAL |
| v. | |
| **LAKE OSWEGO SCHOOL DISTRICT, an Oregon municipal corporation; HEATHER BECK, an individual; JENNIFER SCHIELE, an individual; IAN LAMONT, an individual; KAYLA NORDLUM, an individual; ASHLEY NORDLUM, an individual; and SUZANNE YOUNG, an individual; and UNKNOWN STAFF, unknown individuals**, | |
| Defendants. | |

For their third amended complaint against defendants, plaintiffs allege as follows:

## I.  INTRODUCTION

1.      This is an action involving claims under the United States Constitution, Title IX

of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ("Title IX"), and Oregon state

law, arising out of numerous occurrences of hazing, bullying, retaliation, negligence, and child abuse occurring within an education program or activity.

2.    Plaintiffs were forced to bring this lawsuit.  When a school continually promises to make changes, promises to protect, and promises to hold people accountable but does nothing, something had to be done to force the school to keep its promises.  Specifically, (a) defendants' failed to act in a manner consistent with the policies espoused by both the high school and the school district; (b) defendants' failed to comply with the clear requirements of the United States Constitution, Title IX, and Oregon state law; and (c) defendants' failed to protect the rights afforded to plaintiffs under the United States Constitution.  Plaintiffs previously provided notice under the Oregon Tort Claims Act.

## II. DECISION TO FILE THIS LAWSUIT

3.    This case arises from activities related to S.A.'s selection for and membership on the dance team at Lakeridge High School ("Team").  She is no longer a member of the Team because, despite being ordered to remain silent about the inappropriate, illegal, and immoral activities known, sponsored, supported, and sanctioned by defendants as described in this complaint, S.A. made the courageous decision to speak up about the activities in hopes that others would not have to endure what she, and others too afraid to speak up, endured.  Unfortunately, as a result of speaking up, S.A. has been bullied, cyberbullied, harassed, and retaliated against by numerous students, parents, administrators, and coaches at Lakeridge High School.

4.    S.A.'s parents ("Plaintiff Parents") have also been harassed and cyberbullied incessantly, both privately and publically, in media comments and on social media, and S.A.'s mother ("Plaintiff Mother") has been subjected to racist comments, threats, and attacks both on social media and in public.

5.      Because defendants failed to take any action whatsoever to protect S.A. from the bullying, cyberbullying, harassment, and retaliation that occurred following S.A. speaking up about the hazing and other inappropriate actions of the Team, Team members, Team members' parents, and the coaches, S.A. was forced to resign from the Team.  Indeed, the coaches' actions were retaliatory against S.A.  The coaches wanted S.A. to feel so uncomfortable and unwelcome on the Team that she would resign.

6.      When defendant Jennifer Schiele ("Schiele") was confronted about the lack of action by the Lake Oswego School District ("District") and Lakeridge High School to the bullying, cyberbullying, harassment, and retaliation S.A. was suffering at the hands of the coaches, Young, other Team members, parents, and other students, ***Schiele suggested that Plaintiff Mother file a lawsuit against her and that S.A. find another high school to attend.*** Schiele also stated that she would have to be fired before Kayla Nordlum would be fired.

7.      Schiele has consistently demonstrated  no care or concern for S.A. and has intentionally ignored and shunned her at school.  Schiele continues to do so as of the date of this amended complaint.  Schiele went out of her way to apologize to the Team, however.  On January 4, 2015, Schiele sent the following message via email to Team parents:

> Hello PDT Parents,
>
> Happy New Year!  Kayla and I are going to meet with your daughters tomorrow at 4:30 in the dance room.  Heather Beck and Joe Morlock [*sic*] will also be there.  All of us want to send them the message that we are in support of them as individuals and as a team and we are terribly sorry for all of the pain and suffering that they have endured over the last three weeks.  We also want them to know that we have support staff at school to help with any struggles they are having with the latest media attention.  We have an amazing group of girls on this team and we want to make sure they know it!  I also want you to know that we are in support of Kayla and the work she has done and will be doing with our girls.
>
> Best regards,
>
> Jennifer

Page 3 – THIRD AMENDED COMPLAINT

8.      Despite the report from the District's own investigation revealing hazing and bullying, at no time has anyone at the District (including Schiele, Lamont or Beck) ever reached out to S.A. to apologize for what she has gone through and is going through as a result of disclosing the hazing and other inappropriate conduct described in this Complaint or to thank her for disclosing the hazing, bullying, harassment, and retaliation so that the District could protect her and others from going through anything similar in the future.

9.      The District claims to be taking steps to change the culture of bullying, cyberbullying, hazing, and harassment at Lakeridge High School, hailing the hiring and work of Coaching Peace Consulting, a company hired to help the District combat hazing and bullying. Yet, at no point did anyone connected or affiliated with Coaching Peace reach out to S.A. to address the bullying, cyberbullying, harassment, hazing, and retaliation she and others who quit the Team suffered and continue to suffer.

10.     In addition to seeking damages to compensate S.A. and her parents for their psychological, physical, and other injuries, as well as lost wages for Ray Achcar-Winkels ("Plaintiff Father") resulting from defendants' conduct, plaintiffs seek declaratory and injunctive relief that would put an end to the culture existing at Lakeridge High School that intentionally and knowingly allows its staff, students, and volunteers to (a) interfere with a student's freedom of speech and right to an education, and (b) assault, batter, haze, bully, cyberbully, harass, falsely imprison, sexually harass, and retaliate.

11.     Plaintiffs bring this action to seek damages and other legal redress for conduct and practices of all defendants.  All defendants had duties and responsibilities separately and individually owed to plaintiffs and S.A. and, at all times relevant to the claims and actions stated in this Complaint, all individual defendants acted with the authority given to them as employees and agents of the District.

12.     The acts described in this Complaint involve several separate events, each of which imposes liability on defendants.

### III. JURISDICTION AND VENUE

13.     Jurisdiction is conferred on this court by 28 U.S.C. § 1331 as this action arises under the laws of the United States, specifically 42 U.S.C. § 1983, Title IX, and the First and Fourteenth Amendments to the United States Constitution.

14.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction of the claims based on Oregon law as they are related to claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claims set forth herein occurred within the jurisdiction of this Court.

### IV. PARTIES

16.     Plaintiff Parents, individually and as Parents and Next Friends of S.A., a minor, are residents of the city of Lake Oswego, Clackamas County, Oregon.

17.     S.A., was born on XX/XX/2001.  S.A. attends and has been attending Lakeridge High School, a public high school in the city of Lake Oswego, Clackamas County, Oregon, since the beginning of the 2014-15 academic school year.

18.     Defendant District is a municipal corporation existing by and under the laws of the State of Oregon, with its principal place of business located in the City of Lake Oswego, Clackamas County, Oregon.

19.     During the 2014-15 academic school year, as well as during prior academic years, the District received federal funding and is subject to Title IX.

20.     Defendant Heather Beck ("Beck") is an employee and agent of the District and was at all times relevant hereto employed by the District as the superintendent.  Pursuant to

District policy, as superintendent, Beck serves as the District's chief executive officer and has general supervision of all district schools, personnel, and departments.  (*See*, Lake Oswego School District CB Policy, which is attached hereto as Exhibit 1, and incorporated fully herein.) Beck is responsible for the health, vitality, well being and performance of the District.  As superintendent, Beck has the ability, authority, and duty to take corrective action on behalf of the District to stop discrimination, harassment, violence, hazing, bullying, cyberbullying, child abuse, and retaliation, and to discipline perpetrators of such discrimination, harassment, violence, hazing, bullying, cyberbullying, child abuse, and retaliation.  (*See*, Lake Oswego School District 7J Policy, which is attached hereto as Exhibit 2, and incorporated fully herein.)  Beck has and at all times relevant herein had the duty to comply with all state and federal laws and all applicable District and Lakeridge High School Policies.

21.    Defendant Beck also has and at all times relevant hereto had the duty to ensure that all students' constitutional rights are not infringed upon, to ensure compliance with Title IX, and to prevent the violation of Oregon law (including, but not limited to, negligence related to harassment, violence, hazing, bullying, cyberbullying, child abuse, child abuse reporting, and retaliation) within Lakeridge High School via any of its students, staff, administrators, coaches, teachers, parents, and volunteers.

22.    Defendant Schiele is an employee and agent of the District and was at all times relevant hereto, employed by the District as the principal of Lakeridge High School.  As principal, Schiele has final policy making authority and duties with respect to the day-to-day enforcement of Lakeridge High School's discipline procedures, its anti-harassment and bullying policies, its Athletic Policy and Guidelines (including the athlete Code of Conduct), its Volunteer Guidelines, and the Oregon School Activities Association ("OSAA") Rules.  (*See* true and correct copies of the Lakeridge High School 2014-2015 Handbook, the Lakeridge High School Athletic Policy and Guidelines, the Lake Oswego School District Volunteer Guidelines, and the

District Interscholastic Athletics policy, which are attached hereto as Exhibits 3, 4, 5, and 16 respectively, and incorporated fully herein.)  Schiele has and at all times relevant herein had the duty to comply with all federal and state laws, all applicable District and Lakeridge High School Policies and OSAA Rules.

23.    As principal, Schiele has and all times relevant hereto had the ability, authority, and duty to take corrective action on behalf of the District to ensure all students' constitutional rights are not infringed upon, to ensure compliance with Title IX, and to prevent the violation of Oregon law (including but not limited negligence related to harassment, violence, hazing, bullying, cyberbullying, child abuse, and retaliation) within Lakeridge High School via any of its students, staff, administrators, coaches, teachers, parents, and volunteers.

24.    Defendant Ian Lamont ("Lamont") was at all times relevant herein an employee and agent of the District and was employed by the District as the Athletic Director of Lakeridge High School.  At all times relevant herein, Lamont had the duty to comply with all applicable federal and state laws, District and Lakeridge High School Policies, and OSAA Rules.

25.    As the Athletic Director, Lamont had the ability, authority, and duty to take corrective action on behalf of the District and Lakeridge High School to enforce all applicable polices including the Lakeridge High School Athletic Policy and Guidelines, and the OSAA Rules.  Lamont also had the duty to ensure all students' constitutional rights were not infringed upon, to ensure compliance with Title IX, and to prevent the violation of Oregon law (including but not limited negligence related to harassment, violence, hazing, bullying, cyberbullying, child abuse, child abuse reporting, and retaliation) within Lakeridge High School via any of its students, staff, administrators, coaches, teachers, parents, and volunteers.

26.    Defendant Kayla Nordlum ("Nordlum") was, at all times relevant hereto, employed by and was an agent of the District as the Head Coach for the Team.  Nordlum has and

at all times relevant herein had the duty to comply with all federal and state laws, all applicable District and Lakeridge High School Policies, and OSAA Rules.

27.     As the Team Coach, Nordlum had the ability, authority, and duty to take corrective action on behalf of the District and Lakeridge High School to enforce all applicable policies, the OSAA Rules, and the Lakeridge Junior Cheer & Dance Team Handbook, which is attached hereto as Exhibit 6 and fully incorporated herein.  Nordlum also had the duty to ensure all students' constitutional rights are not infringed upon, to ensure compliance with Title IX, and to prevent the violation of Oregon law (including but not limited negligence related to harassment, violence, hazing, bullying, cyberbullying, child abuse, and retaliation) within Lakeridge High School via any of its students, staff, administrators, coaches, teachers, parents, and volunteers.

28.     On social media, Nordlum previously used the name "Kayla Diane."  Nordlum has tried to justify certain decisions she made by claiming that (a) she has been a dance team coach for 9 years and (b) she has only been a dance team coach for 1 year.  During the events at issue in this lawsuit, Nordlum was 24 years old.

29.     Defendant Ashley Nordlum ("Ashley") was, at all times relevant hereto, employed by and was an agent of the District as the Assistant Coach for the Team.  Ashley has, and at all times relevant herein had, the duty to comply with all federal and state laws, all applicable District and Lakeridge High School Policies, and OSAA Rules.

30.     As the Team Assistant Coach, Ashley had the ability, authority, and duty to take corrective action on behalf of the District and Lakeridge High School to enforce all applicable policies, the OSAA Rules, and the Lakeridge Junior Cheer & Dance Team Handbook.  Ashley also had the duty to ensure all students' constitutional rights are not infringed upon, to ensure compliance with Title IX, and to prevent the violation of Oregon law (including but not limited negligence related to harassment, violence, hazing, bullying, cyberbullying, child abuse, and

retaliation) within Lakeridge High School via any of its students, staff, administrators, coaches, teachers, parents, and volunteers.

31.     Defendant Suzanne Young ("Young") was at all time relevant herein the manager of the Team and a member of the Team coaching staff (as defined by OSAA Rules).  She was the Chief Financial Officer ("CFO") for the Team and she was also in charge of Public Relations for the Team, until she tendered her resignation to Beck in January 2015.  At all times relevant herein, Young acted with the approval and authority of the District and as an agent of the District.  At other times, Young acted as an approved volunteer who had a duty to comply with the District Volunteer Guidelines.  Young also had a duty to comply with all District and Lakeridge High School policies pertaining to hazing, harassment, intimidation, bullying, menacing, and cyberbullying.  (*See, e.g.,* Lake Oswego School District Policy 7J) ("Hazing, harassment, intimidation or bullying, menacing and acts of cyberbullying by students, staff or **third parties** is strictly prohibited and shall not be tolerated in the district.")  Young also had a duty to comply with OSAA Rules.

32.     According to documents obtained from Nordlum, during the 2014-15 academic year, Young received compensation from the Pacer Dance Team for her services.  In addition, during the 2014-15 academic year, the District, Schiele, Lamont, and Nordlum gave Young the authority to engage in contracts on behalf of the Team.

33.     Prior to the 2014-15 academic year, Young had a daughter on the Team and gained substantial knowledge of the Team's traditions, including, but not limited to, the traditions of an initiation process that amounts to hazing.  Young also knew about inappropriate games traditionally played by the Team.  Young's knowledge is established, in part, based on her publically shared photos of past initiation events on her Google+ account as well as least one photo shared by her daughter on social media.  (*See* Exhibit 14 attached hereto.)

34.     On information and belief, Young discussed the initiation traditions with Schiele

prior to August 9, 2014.  As mentioned above, Young posted photographs of the past initiation

activities / traditions on social media, and hosted at least one year's initiation activities /

traditions at her home.

35.     Young attended numerous bonding and other traditional Team events.  On

information and belief, Young told Schiele, Nordlum, and Ashley about the past bonding and

other traditional Team events.

36.     Young previously collected money from Team parents and students to facilitate

initiation activities.

37.     Defendants, unknown staff and volunteers of the District (hereinafter referred to

as "Unknown Staff"), at all times relevant hereto, were employed by and/or were agents of the

District and at all times relevant herein acted with the authority of the District.  Unknown Staff

are comprised of, but not limited to, Staff 1 and Staff 2.  Staff 1 is a Lakeridge High School

employee.  She works in the high school's main office and is also a librarian at the school.  Her

daughter is on the Team.  Staff 1 has personal knowledge of the tradition of hazing at Lakeridge

High School and on the Team and advised Plaintiff Mother to keep quiet about the hazing

events.  Staff 1 also has personally been involved in retaliatory actions toward S.A.   Staff 2 is a

Lake Oswego School District employee.  She works at one of the elementary schools within the

District.  Her daughter is also on the Team.  She has personal knowledge of the tradition of

hazing at Lakeridge High School and on the Team and advised Plaintiff Mother to keep quiet

about the hazing events.  The husbands of Staff 1 and Staff 2 have incessantly attacked plaintiffs

on social media.

38.     Plaintiffs allege that each of the defendants, Staff 1 and Staff 2, and Unknown

Staff performed, participated in, or aided and/or abetted in some manner the acts averred in this

action, proximately caused the damages averred below, and are liable to plaintiffs for the

damages and other relief sought in this action.

## V.  DISTRICT POLICIES DISREGARDED BY DISTRICT AND DEFENDANTS

39.    The District and Lakeridge High School have policies, which were at all relevant times applicable to defendants' and Staff 1 and 2's conduct.  These policies are attached hereto and incorporated by reference herein as exhibits 2, 7, 8, 9, 10, and 16.

40.    As described in more detail throughout this Complaint, defendants and Staff 1 and 2 failed to comply with the District's policies, the Lakeridge High School Policies, and the OSAA Rules.  As a result, S.A. suffered damages as more fully described herein.

41.    As described in more detail throughout this Complaint, defendants and Staff 1 and 2 failed to comply with the District and Lakeridge High School policies and, as a result, Plaintiff Parents and S.A. suffered damages as more fully described herein.

## VI. FACTUAL ALLEGATIONS

42.    As a 14 year old freshman, S.A. began attending Lakeridge High School on September 2, 2014, the first day of Lakeridge High School's 2014-2015 academic school year. S.A., at all times material to this action, was a student at Lakeridge High School, and participated in extracurricular activities sponsored by Lakeridge High School including being a dancer on the Team.

43.    Prior to August 2010, S.A., her brother, and parents resided outside of Oregon.  In 2011, Plaintiff Parents made the decision to move to Lake Oswego, Oregon, after carefully researching the schools in Oregon, including Lakeridge High School, and considering the promises and representations made by various schools and school districts about the quality of education, the safety of the students, and the types of number of extracurricular activities, Plaintiff Parents, decided to move to Lake Oswego, Oregon.

44.    In or about May 2014, S.A., still in junior high school, was 14 years old and was excited to audition for a spot on the 2014-2015 Team.  If she made the Team, S.A. would be one

of a few likely freshmen on the Team. Prior to May 2014, S.A. had been a member of the Junior Pacer Dance Team at Lakeridge Junior High School for 2 years.

45.     S.A. auditioned for and became a member of the Team. Upon learning that she had made the Team, S.A. was extremely excited and proud. So were her parents. Her parents knew that the long hours that S.A. spent at dance classes together with her determination and diligence, were paying off. The pride, as well as excitement, that S.A.'s parents felt for her was boundless. Unfortunately, the excitement felt by all plaintiffs began to wane as a result of events that eventually led to S.A.'s assault, harassment, bullying, cyberbullying, physical injuries, degradation, emotional distress, constructive and retaliatory expulsion from the Team, and ongoing retaliation, bullying, harassment, and cyberbullying.

46.     The Team began regular practice in June 2014.

47.     As a member of the Team, S.A. was required to attend several events, apart from regular practices. The first was a "team bonding trip" to Gearhart, Oregon, on June 28-29, 2014. The second was an "initiation" on August 9-10, 2014, in Lake Oswego, Oregon. The third was a "mandatory boot camp" in Sunriver, Oregon, from August 24-28, 2014.

48.     As a member of the Team, S.A. attended each of the three events described in paragraph 47 above.

49.     Lamont, Schiele, Nordlum, and Ashley, knew and approved of the events described in paragraph 47 above.

50.     Lamont's knowledge of the tradition of team initiations is documented in email correspondence to him from at least one other coach who referenced Lamont's knowledge of the tradition of initiation events at Lakeridge High School

51.     Beck, who became superintendent for the District on July 1, 2014, knew or should have known of the initiation and boot camp events.

52.     Young knew about and promoted the initiation and Team bonding events to S.A. and Plaintiff Mother prior to the events occurring, describing them as traditions and fun.

53.     On information and belief, Young also told Nordlum about the Team's traditions with regard to initiation and Team bonding.  Young and Nordlum maintained constant communication throughout the Team season and Young provided guidance and information to Nordlum on how the Team traditionally and historically operated.

54.     Nordlum not only learned about the initiation and Team bonding traditions (*e.g.*, a game called "10 fingers") from Young, she also was warned about them from Plaintiff Mother. Plaintiff Mother learned of the events from Young.  Plaintiff Mother told Nordlum what she learned from Young prior to the initiation and bonding activities scheduled occurrence.  Plaintiff Mother told Nordlum about what she learned from Young in hopes of preventing them from happening in the future. .

55.     Upon information and belief, Nordlum shared what she learned from Young and Plaintiff Mother with Ashley.

56.     Despite the knowledge of prior inappropriate initiation events and other inappropriate activities, defendants did not act to prevent their occurrence.

57.     Upon information and belief, Schiele solicited Young for advice related to the Team.

    a.     **<u>Gearhart, Oregon Bonding Weekend</u>**

58.     During the team bonding trip to Gearhart, Oregon, with the approval and knowledge of Nordlum and Ashley, S.A. was forced to listen to Team members who, during a team tradition --- a gamed called "10 fingers" – shared highly offensive sexual activities, using sexually explicit language (too crude to include here).  Nordlum was aware that such talk occurred at prior team bonding events and assured Plaintiff Parents that it would not occur. Despite that assurance, Nordlum encouraged and approved of the humiliating conversations.

Nordlum intentionally left the Team members alone at a time prearranged with the Team seniors so that the game could be played.

59.      Also during the team bonding trip to Gearhart, Oregon, Nordlum and Ashley returned to Portland, Oregon, early and unscheduled.  S.A. was left stranded in a neighboring city, Seaside, Oregon, without a ride home.  Oddly, however, Nordlum abandoned S.A. in Seaside, Oregon, thinking Plaintiff Parents were 2 hours away in Lincoln City, Oregon.

**b.      Initiation**

60.      Upon information and belief, the Team has a longstanding tradition of conducting an initiation event that amounts to hazing of the freshman, sophomore, and junior Team members.  Initiation events have been conducted on the Team for at least **10 years**.  Nordlum told Plaintiff Parents and other Team member parents that the initiation would be safe and fun and that it would take place at the junior high school.

61.      During the August 9, 2014, initiation event, the senior Team members arranged activities intended to terrorize, humiliate, endanger, harass, assault, and batter the rest of the Team members, as was the tradition.

62.       On August 9, 2014, S.A.'s cellular phone was taken from her.  She was placed in a humiliating costume, blindfolded and put into a car, where she sat on the floor (without any restraint) while she was driven to a location not disclosed to S.A.  The cars driven around by seniors on August 9, 2015, had sexually explicit comments written on the windows.

63.      Upon arriving in downtown Lake Oswego, the senior Team members required the other team members to pull little pieces of paper out of a hat.  On the pieces of paper were listed activities that were intended to embarrass the Team members and harass the citizens in downtown Lake Oswego, Oregon. The activities included, but were not limited to, dancing on tables, kissing strange men, and yelling obscenities at restaurant guests.  Lake Oswego, Oregon police were called.  On information and belief, a police report was filed by a downtown

restaurant about Team members' inappropriate sexual and vulgar conduct, and disturbing the peace.

64.     Around 9:35 p.m., S.A. was eventually taken to a field at Lakeridge High School where approximately 25 – 30 male and female high school students were waiting to terrorize S.A. and the other Team members. The senior high school Team members had invited the other students to attend the initiation and were encouraged to harass and humiliate S.A. and other Team members. It was obvious from the odors at the field, that some of the invited students had been drinking and smoking marijuana.

65.      Some of the students shouted sexually explicit instructions and profanity at the blindfolded Team members, including but not limited to, sex-based name-calling of the Team members ("sluts," "whores," *etc.*), shouting "suck my dick" to the members of the Team being subjected to initiation, and receiving instruction from senior Team members to dance with male onlookers.

66.     Upon arriving at Lakeridge High School, S.A. was removed from the vehicle she was riding in. Still blindfolded, she and other Team members were put in a line and the other students threw water balloons at S.A. and others. On information and belief, the water balloons contained oatmeal because when the balloons hit S.A., it was painful. Students also large water guns filled with ketchup and mustard, which were sprayed at S.A. and other Team members. When the guns were emptied, they were thrown at S.A. and other Team members. S.A. was hit in the face, body, and chest with water balloons. S.A. was hit so hard in the chest she was bruised.

67.     When there were no more water balloons and the water guns were empty, S.A. was allowed to remove her blindfold and told to remove her costume. The senior Team members had previously told S.A. to wear a bikini under her costume so now S.A. and other Team members were standing in front of the crowd in their bikinis. A garbage bag was placed

over S.A. (her head was exposed) and she and other Team members were required to roll around on a tarp covered in maple syrup and oatmeal wrestling with one another. The on looking students threw feathers on S.A. and other Team members. Male students pushed and grabbed S.A. and pushed her into other Team members. S.A. and other Team members were told to dance with and for the male students.

68.    Following the water and tarp activities, S.A. was placed back into a vehicle, blind folded, and was again forced to sit on the floor with no restraint. Around 11:00 p.m., S.A. and other Team members arrived at George Rogers Park where S.A. was forced to walk into the cold Willamette River in her bikini. S.A. and the other Team members had to answer questions posed to them by the senior Team members. S.A. and other Team members had to take steps into the river if they answered a question incorrectly. The subjects of the questions were Nordlum and Ashley and Nordlum was specifically involved in planning this portion of initiation. S.A. was not wearing shoes and was not provided with any safety jacket just in case she fell. S.A. and the other Team members were only allowed to come back to shore after they were so deep in the water that they could not keep going in. After they came out of the water, S.A. and other Team members were told that they had to run after the cars and catch them if they wanted a ride. S.A. was in her bare feet and her feet ended up swollen and red after all of the various events, including running through the parking lot chasing a car for a ride.

69.    Although she was not present for the initiation, Schiele, Nordlum, Ashley, and Young knew about the activities in advance of the evening but did nothing. It was Young who told Plaintiff Mother of the initiation traditions and Plaintiff Mother notified Nordlum to make sure that no similar traditional events would happen. Nordlum assured Plaintiff Mother that nothing bad would happen and, in fact, misrepresented to Plaintiff Mother what would happen that night.

70.     District, Lamont, Schiele, and Nordlum are aware that similar traditional initiation activities have happened in the District and at Lakeridge High School for years and have not done anything to prevent them from continuing despite such activities being in clear violation of applicable policies, OSAA Rules, and state and federal laws.

71.     At no point during the initiation was S.A. given the opportunity to speak to a parent or coach about what was happening to her.  S.A. was not given the choice or opportunity to walk away or refuse to participate.  She was blindfolded, harassed, assaulted, physically harmed, bullied, intimidated, afraid, humiliated, abused, and sexually harassed all with the knowledge and consent of the District, Schiele, Lamont, Nordlum, and Ashley.

72.     S.A. did not ask to have her dignity taken from her on August 9, 2014, but indeed it was.

73.     On August 11, 2014, S.A. spoke to the Team's technique coach about the activities of August 9, 2014.  S.A. specifically indicated that she was talking to the technique coach about the events not to hurt the Team but because she did not want to go through anything like August 9 again.  Recognizing her duty to report the August 9, 2014, events as hazing, the technique coach reported the hazing to Nordlum and Lamont the very same day.  S.A.'s name was only revealed to Lamont at that time so as not to provide anyone at Lakeridge High School with an opportunity to retaliate against S.A..  Nordlum was not told S.A.'s name and she was very upset and angry about this.

74.     The activities that made up the 2014-2015 Team initiation event, and the activities that comprised prior Team initiation events, were aimed at exploiting the sensitivities of young women.

75.     Upon information and belief, the conduct described in paragraphs 60-74 above, is unique to the initiation events of all-girls' sports teams and is distinct from the initiation events that may have taken place on the all-boys' sports teams within the District.

c.      **Sunriver, Oregon Boot Camp**

76.     During the boot camp at Sunriver, Oregon, several girls were assigned to sleep in each room.  On the first night of the boot camp, Nordlum used duct tape to lock the girls in their rooms for the entire night.  Nordlum claims it was so she could be sure the girls did not sneak out.

77.     Also during boot camp, Nordlum and Ashley told the Team members to close their eyes and she took them on a "trust" walk in the dark.  Eventually, the girls were seated in a circle.  Nordlum and Ashley requested that the Team member share a tragic story from their lives.  Nordlum and Ashley spoke of events too personal to mention here but which were of a very sensitive nature and inappropriate for a coach without any special training to discuss with high school kids.  The Team members also spoke of highly sensitive issues (also too personal to mention here) without the presence and benefit of a counselor to help the Team members deal with and process what they were sharing and hearing.  The demand for such sensitive stories was a violation of S.A.'s privacy.

78.     Nordlum and Ashley learned information from the stories described in paragraph 77 above that required certain mandatory reports under Oregon law, District policy, and Lakeridge High School policy. Neither of them took any action to report or address the information learned.

79.     Also during boot camp at Sunriver, Oregon, Nordlum and Ashley asked the Team members to meet with them privately by school grade level so they could discuss the August 9, 2014, events. It was clear that Nordlum and Ashley were arranging these meetings to try to figure out who spoke to Lamont about August 9, 2014.

80.     When S.A., together with the seven other freshmen, met with Nordlum and Ashley, the group was asked about their thoughts on the August 9, 2014, initiation.  Nordlum further pressed S.A. for what, if anything, she had to say about initiation and if anything had

bothered her about the night.  Nordlum and Ashley, in violation of S.A.'s freedom of speech, told S.A. that this was her last opportunity to discuss initiation because, thereafter, she was to keep quiet.  Prior to Sunriver, Oregon, Nordlum had previously expressed to the Team members that there was to be no discussion about the August 9, 2014, events.

81.    During her meeting with Ashley, Nordlum, and the other freshmen Team members, S.A. was in fear and intimidated by Nordlum and Ashley, as well as afraid to say anything to upset the other Team members.  Consequently, S.A. had no choice but to say "no." Nordlum asked S.A. specifically again if she had any issues or problems with initiation and she repeated "no."  S.A. was eventually excused from the meeting with Nordlum and Ashley.  S.A. called her parents.  S.A. was now in tears because she believed that, based on Nordlum's questioning, everyone knew she had talked to the school administration about the initiation.  It was apparent Nordlum and Ashley were targeting S.A. for discussing initiation.

82.    On or about August 28, 2014, while she was in Sunriver, Oregon, Nordlum communicated with the technique coach via text.  Nordlum told the technique coach that she believed there was no hazing on August 9, 2014, and the 14 year old girl that came forward was a liar.  Nordlum blamed the unknown student and her mother for spreading rumors and exaggerating what happened.  Nordlum demanded to know S.A.'s name.  After the technique coach refused to share the name with her, and directed Nordlum to Lamont, Nordlum threatened the technique coach, in a string of long texts, with having her removed from her position if she did not reveal S.A.'s identity. The technique coach quit.

83.    On August 28, 2014, apparently Nordlum now believed S.A. spoke to school officials about the August 9, 2014 activities.  Nordlum sent an email to Plaintiff Mother accusing S.A. of lying about the initiation events and stating:

> I need to address something that has caused a lot of havoc that I
> think you may know something about. The details that we hear you
> are saying happened at initiation are not true and I'm pretty upset
> that for one you would believe I would allow something like that to

happen and for two that you would go to everyone and talk about it. It has made me feel very upset and I don't understand why you would spread something like this about my team without coming directly to me with your concern. That is one thing I ask of all of my parents.

\* \* \*

*I hope I don't hear anything more about this night from anyone else but you, but if I do it could result in some sort of suspension for [S.A.].  It isn't fair to my team and I won't have it.*

### d.    Retaliation, Bullying, Cyberbullying

84.    After the Sunriver, Oregon trip, S.A. was perceived by Team members as a snitch. Many Team members tweeted and posted negatively about S.A. and bullied and harassed her at school.  S.A. was harassed during practice by Nordlum and some of the Team members.

85.    Young told plaintiffs that S.A. broke the Team code of silence when she reported the activities described in this Complaint that the senior Team members were going to make her pay.

86.    On September 4, 2014, Nordlum took S.A. off of the "jazz competition team" without any warning.

87.    On September 19, 2014, without any warning whatsoever and immediately prior to the start of the homecoming football game, and even though S.A. was wearing her Team costume, Nordlum advised S.A. that she was not allowed to participate in the cheer activities. Instead, Nordlum demanded that S.A. stand on the side while everyone else on the Team participated in the cheer activities.

88.    On September 22, 2014, as a result of the intentional and retaliatory treatment by Team members, Nordlum, and Ashley, and the intentional decision of Schiele to do nothing, S.A. was forced to leave the Team.  Nordlum never asked S.A. why she was leaving and she never asked how she was doing.  Given S.A.'s love of dance, S.A. was forced to take dance classes at a private dance studio.  S.A. would have preferred to dance on the Team but had suffered such

retaliation, abuse, ridicule, bullying, and cyberbullying as a result of her decision to discuss the August 9, 2014 events, participation on the Team would be impossible.

89.    S.A. has been continually bullied, harassed, and cyberbullied at school by Staff 1, students, and Team members.  The bullying, harassment and cyberbullying has been intentionally supported by Young through her public and social media statements, the intentional lack of action by the District, Beck, Schiele, and Lamont, and the intentional encouragement of Nordlum and Ashley.

90.    Young posted comments about Plaintiff Mother (who is of Brazilian descent) on Facebook (attached hereto as Exhibit 11 and incorporated fully herein) and sent harassing texts to her.  (*See*, Exhibit 12, attached hereto and fully incorporated herein.)  Young has publically called Plaintiff Parents and S.A. liars with the intent to harm Plaintiff Parents' reputations and their well being in the tight knit community of Lake Oswego.  Young has acted with the intent to intimidate Plaintiff Mother by speaking to others about her while Plaintiff Mother is present, following her, and threatening to damage Plaintiff Mother's car.

**e.    District Investigation, Response, and Duties**

91.    The District requested that the Hungerford Law Firm conduct an investigation of the various events described herein.  (A copy of the summary report is attached hereto as Exhibit 13 and fully incorporated herein.)  Plaintiffs were denied access to the full report until the District Attorney for Clackamas County ordered the report to be released as a result of plaintiffs' public records request.  When the summary report was made public, Plaintiff Parents and S.A. were intentionally attacked publically by Young, accusing Plaintiff Parents and S.A. of being liars and of wanting to destroy the Team.  Team members, Team members' parents, Staff 1 and 2's spouses, students, and many others in Lake Oswego also publically attacked Plaintiff Parents and S.A.

92.     The District, Beck, Schiele, Lamont, Nordlum, and Ashley have done nothing to sufficiently address the misconduct of the senior Team members and have failed to provide a safe school environment for S.A.  Indeed, in January 2015, all of the senior Team members received gifts from the school and Team instead of being reprimanded in any way.  Schiele and Lamont have shown nothing but constant support of and for the Team and Nordlum through Facebook postings and photos, as if the senior girls and the coaches had done no wrong.   S.A., on the other hand, was continually harassed, bullied, and cyberbullied at school and afterschool by students and Team members.

93.     All acts and practices of Lakeridge High School, as alleged within this Complaint, were acts, conduct, errors, and omissions of the District through its agents, employees, trainees, volunteers, and assigned parents, all or some of which deprived S.A. of rights, privileges, and immunities under color of law as that term is defined by 42 U.S.C. § 1983.

94.     All acts and practices of the individual defendants, as alleged within the confines of this Complaint, were acts, conduct, errors and omissions of the District through its agents and employees, all or some of which deprived plaintiffs of rights, privileges and immunities under color of law as that term is defined by 42 U.S.C. § 1983.

95.     From at least between the dates of June 2014, through present and beyond, all defendants have embarked on a course of conduct wherein its actions were deliberately indifferent to ongoing and multiple incidences of fellow student hazing, harassment, bullying, and cyberbullying directed to and inflicted upon S.A.

96.     The defendants knew or should have known that the ongoing and multiple incidences of fellow student hazing, harassment, bullying, and cyberbullying were occurring yet did nothing to control and/or stop such illegal conduct.

97.     From at least between the dates of June 2014, through present and beyond, the defendants were deliberately indifferent to the complaints being registered to one or more

defendants by S.A. and Plaintiff Mother on behalf of her herself and S.A., with respect to the failure of Lakeridge High School and the District to provide protection and an education with respect to certain activities and conduct which threatened both the physical and emotional well-being of S.A. and the educational climate conducive to learning that was to have been provided to S.A. as a student at Lakeridge High School.

98.    From at least between the dates of June 2014, through present and beyond, the defendants embarked on a course of conduct wherein they were deliberately indifferent to complaints being registered to one or more of said defendants from sources, including but not limited to complaints from Plaintiff Parents, concerning harassment, hazing, retaliation, and other illegal conduct, which was being directed toward S.A. while she was on the Team and a student attending Lakeridge High School.

99.    The District, Beck, Schiele, and Lamont ignored an obvious need to train and supervise its employees, agents, volunteers, and students on addressing hazing, child abuse, assault, peer harassment, bullying, and cyberbullying and the lack of such training and supervision caused plaintiffs to suffer injuries described in further detail below and throughout this Complaint.

100.    The harassment, hazing, bullying, cyberbullying, retaliation, and other illegal conduct was being directed toward S.A. from at least fellow Team members, Young, staff (including Staff 1), students, parents, third-parties, and from defendants.  (Examples of Young's public retaliation against S.A. and her parents can be seen in Exhibit 15.)

101.    The defendants, either had direct knowledge that such harassment, hazing, child abuse bullying, cyberbullying, retaliation, and illegal conduct was occurring or should have known that it was occurring and, despite having such knowledge and information, failed in every major respect to prevent such harassment, child abuse, hazing, bullying, cyberbullying, retaliation, and illegal conduct from occurring.

102.    The hazing, harassment, child abuse, bullying, cyberbullying, retaliation, and illegal conduct was so severe, pervasive, and objectively offensive that it deprived S.A. of access to the educational opportunities, because she was told to miss at least one assembly, she was afraid and too stressed to go to school, she was so stressed she became ill and had to miss school, and she was so stressed her class work suffered.  In addition, the conduct deprived S.A. of access to extra-curricular activities, and/or other benefits afforded by the District and to which S.A. was entitled as a student attending high school within the State of Oregon and within the United States of America.

103.    The defendants, at all times material to this Complaint, had the duty and authority to take remedial action to eliminate the hazing, harassment, bullying, cyberbullying, retaliation and other illegal conduct engaged in and directed toward S.A. by students, agents, employees, and volunteers and were deliberately indifferent to providing requisite protection to S.A. and in affording her all rights incident to attending high school to which she was entitled as a student attending high school within the State of Oregon and within the United States of America.

104.    The District, Beck, Schiele, and Lamont exercised substantial control over the students, staff, Young, Nordlum, and Ashley who engaged in multiple episodes of hazing, child abuse, harassment, sexual harassment, false imprisonment, bullying, cyberbullying, retaliation, and other illegal acts and, in addition, exercised substantial control within the parameters and area within which the illegal activities, as alleged, occurred.

105.    Misconduct forming the basis of this lawsuit, as alleged, occurred during instances where the students were under direct supervision of the defendants either at school sponsored functions and/or on property under the management and control of defendants.

106.    The defendants at all times material, retained substantial control over the context and environment in which the hazing, child abuse, harassment, sexual harassment, bullying, cyberbullying, retaliation, and other illegal acts occurred and, additionally, exercised significant

Page 24 – THIRD AMENDED COMPLAINT

control by which it could have and should have prevented the hazing, child abuse, harassment, sexual harassment, imprisonment, bullying, cyberbullying, retaliation, and illegal acts.

107.    The District, Beck, Schiele, and Lamont at all times material, hereto, had disciplinary authority and obligations over students attending Lakeridge High School, employment authority and obligations over Nordlum and Ashley, and had the authority to prohibit Young from serving as a volunteer and coach for the District.

108.    The defendants, all times material, hereto, failed to prevent such hazing, child abuse, harassment, sexual harassment, bullying, cyberbullying, retaliation, and other illegal acts and conduct from occurring.

109.    The defendants, acting individually and through agents, employees, volunteers, and participating parents, had a duty to protect the rights of S.A. and her family.

110.    Furthermore, said defendants knew or should have known that policy guidelines clearly provide that hazing, child abuse, harassment, sexual harassment, bullying, cyberbullying, retaliation, and other illegal acts fall within the scope of the laws of the State of Oregon and the United States Constitution.  Each act that forms the basis of this Complaint was carried out individually and during the scope and course of employment, authorization and/or agency by said defendants and, therefore, said acts are imputed to defendants.  Alternatively, conduct of defendants may have been outside defendants' scope of the responsibilities and may have been willful and/or wanton.

111.    Unless otherwise noted, at all times relevant to this action, defendants were acting in a ministerial, operational, and non-discretionary capacity and/or performing ministerial, operational, and non-discretionary functions or duties.

112.    The District, Beck, Schiele, Lamont, Nordlum, and Ashley owed plaintiffs a duty of care to ensure the safety and well-being of S.A. and all students. This overall duty of care encompassed a duty to supervise the conduct of all students, to enforce rules and regulations

necessary for the protection of students, and to take appropriate measures to protect students from the misconduct of third- parties, staff, administrators and other students. The District, Beck, Schiele, Lamont, Nordlum, and Ashley had a duty to exercise due care to protect S.A. from harassment and other misconduct by students, parties, staff, administrators, third-parties and other defendants. Encompassed within the District, Beck, Schiele, Lamont, Nordlum, and Ashley's duty to protect S.A. and other students was a duty to exercise due care in investigating plaintiffs' complaints of hazing, harassment, child abuse, bullying, cyberbullying, retaliation and other illegal acts; to take reasonable precautions to protect S.A. from hazing, harassment, child abuse, bullying, cyberbullying, and other illegal acts that reasonably could be anticipated; to make police reports of the crimes; to take prompt and appropriate action to protect S.A. from further harassment and fear; and to remove dangerous students from the school, if necessary. The District, Beck, Schiele, Lamont, Nordlum, and Ashley owed every duty alleged in this paragraph to plaintiffs.

113.    Each defendant has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others.

## VII.    FIRST CLAIM FOR RELIEF

### (42 U.S.C. § 1983—VIOLATION OF THE FIRST AMENDMENT)

#### (Against District, Schiele, Nordlum, and Ashley)

114.    Plaintiffs reallege and incorporate by reference each paragraph, heretofore alleged, within the body of this Complaint as though fully, herein and/or hereinafter, set forth.

115.    The First Amendment to the United States Constitution, as applied to the States by the Fourteenth Amendment to the United States Constitution, guarantees the right to freedom of speech. The First Amendment states: "Congress shall make no law * * * abridging the freedom of speech."

116.    S.A.'s reporting of the activities described in this Complaint constitutes speech protected by the First Amendment to the United States Constitution, as applied to the states through the Due Process Clause of the Fourteenth Amendment.

117.    The District, Schiele, Nordlum, and Ashley, as well as Young, Staff 1, students, several members of the Team, and Team parents retaliated against S.A. for her speech.  Nordlum threatened S.A. if she said anything more to anyone about the activities alleged in the Complaint.

118.    The District, Schiele, Nordlum, and Ashley did not have a constitutionally justifiable reason to retaliate against S.A. for her speech or for allowing students, staff (including Staff 1) and third-parties to retaliate against S.A. for her speech.  Neither did the District, Schiele, Nordlum, and Ashley have a constitutionally justifiable reason to compel S.A. to remain silent about the activities described in this Complaint.

119.    Acting intentionally and under the color of state law, the District, Schiele, Nordlum, and Ashley violated S.A.'s rights under the First Amendment to the United States Constitution by retaliating against her and by allowing students, staff, and third-parties to retaliate against her, for her constitutionally protected speech.  Acting intentionally and under the color of state law, the District, Schiele, Nordlum, and Ashley failed to protect S.A. following her initial reporting of the activities described in the Complaint.

120.    S.A. has a clearly established right not to be subject to retaliation for speech that does not present an actual or potential "material and substantial" disruption of the school environment, such that reasonable school officials would have known that retaliating against her for her reporting of the various activities described in this Complaint was impermissible.

121.    The District, Schiele, Nordlum, and Ashley violated S.A.'s First Amendment rights by retaliating against her for speaking up about the activities described in the Complaint, for threatening her if she spoke any further about the events described in the Complaint, and for

threatening her for speech that did not present an actual or potential "material and substantial" disruption at Lakeridge High School.

122.    S.A.'s injuries were caused by the District's deliberately indifferent failure to protect S.A.'s First Amendment rights and to ensure that District and/or Lakeridge High School employees do not trample on those rights.

123.    As a direct and proximate result of the violation of 42 U.S.C. § 1983, S.A. has been subjected to physical injury, pain and suffering, severe emotional distress, frustration, apprehension, trouble, uneasiness, concern, anxiety, worry, fright, panic, alarm, fear, tension, pressure, strain, stress, and loss of enjoyment of life in amounts to be proven at the time of trial.

124.    As a direct and proximate result of the violation of 42 U.S.C. § 1983, S.A. has incurred and will incur in the future medical expenses and psychological expenses and other special and consequential damages, all in amounts to be proven at the time of trial.  She will also incur costs to continue to take dance lessons because she was forced off of the school dance team.

## VIII.  SECOND CLAIM FOR RELIEF

### (42 U.S.C. § 1983—VIOLATION OF THE FOURTEENTH AMENDMENT)

#### (Against District, Beck, Schiele, Lamont, Nordlum, and Ashley)

125.    Plaintiffs reallege and incorporate by reference each paragraph, heretofore alleged, within the body of this Complaint as though fully, herein and/or hereinafter, set forth.

126.    The right to due process of law as applied to the states is secured by the Fourteenth Amendment to the United States Constitution, which provides that no state "shall * * * deprive any person of life, liberty, or property, without due process of law."

127.    The behavior of the District, Beck, Schiele, Lamont, Nordlum, and Ashley is so egregious and outrageous that is shocks the contemporary conscience or interferes with rights implicit in the concept of ordered liberty.

128.    At the relevant times, S.A. had both a statutory right and a duty to attend Lakeridge High School (*see* ORS 339.010 and 339.115(1)), and a constitutional right to due process for any determination resulting in the deprivation of her right to attend Lakeridge High School.

129.    The District violated the due process guarantees of the Fourteenth Amendment by failing to enforce its policies with regard to bullying, harassment, hazing, etc.  By failing to follow its policies, S.A. was deprived of her right to an education (*e.g.,* she was told to attend a different school, told to avoid certain school activities, bullied and harassed so much that she was stressed, scared, was forced to stay home from school because not even the principal would protect her).

130.    The District's policies are clear on the rights of students to be protected from bullying, harassment, hazing, etc. but the District's enforcement of those policies is arbitrarily and capriciously enforced.  Specifically, no students, third- parties, or staff were reprimanded for bullying, hazing, and harassing of S.A. or for allowing the bullying, hazing, and harassing of S.A.  There is no rational basis for evaluating the District's enforcement of its policies (or lack thereof).

131.    As a direct and proximate result of the violation of 42 U.S.C. § 1983, S.A. has been subjected to physical injury, pain and suffering, severe emotional distress, frustration, apprehension, trouble, uneasiness, concern, anxiety, worry, fright, panic, alarm, fear, tension, pressure, strain, stress, and loss of enjoyment of life in amounts to be proven at the time of trial.

132.    As a direct and proximate result of the violation of 42 U.S.C. § 1983, S.A. has incurred and will incur in the future medical expenses and psychological expenses and other special and consequential damages, all in amounts to be proven at the time of trial.  She will also incur costs to continue to take dance lessons because she was forced off of the school dance team.

## IX.  THIRD CLAIM FOR RELIEF

## (VIOLATION OF TITLE IX, 20 U.S.C. § 1681(a))

### (Against Defendant District)

133.    Plaintiffs reallege and incorporate by reference each paragraph, heretofore alleged, within the body of this Complaint as though fully, herein and/or hereinafter, set forth.

134.    The District had actual knowledge of the longstanding tradition of hazing during the Team initiation events at Lakeridge High School.

135.    The District had actual knowledge of the substantial risk that S.A. would be subjected to treatment that amounts to sex-based discrimination during the course of the Team initiation event based on the District's knowledge and photos made public by Young and others of events during the Team's prior initiations.

136.    The District, and its agents, administration, coaches, and staff had the authority to address the risk posed by this longstanding tradition of initiation events.

137.    The District ignored the risks related to Team initiations and instead pretended they did not occur.  The District did not take any action to ensure Team initiations were stopped altogether or at least modified to ensure they complied with federal, state, and local laws.

138.    During this time, the District failed to take effective correction action to end the hostile education environment S.A. was and is experiencing because of her reporting of the initiation activities, or to ensure S.A.'s full and equal access to education benefits and opportunities.

139.    Rather, the District delayed in taking any action while it prioritized competing and winning dance competitions over the health, safety, and welfare of its students, including S.A., so that the Team members could continue to compete.

140.    While it was delaying taking any action, Nordlum, Ashley, and the Team members, were rewarded by the District, Schiele, and Lamont with new robes, parties, and

flowers.  In addition, despite the fact that neither Schiele nor Lamont had previously attended Team competitions, both attended Team competitions despite the revelation by the District's own investigator found that hazing occurred on the Team.

141.    Even after launching an investigation, which concluded that hazing occurred, and after repeatedly reporting the hostile educational environment to the District, Schiele, and Beck, the District failed to take any action to protect S.A. and the senior Team members were not reprimanded or punished in any way.

142.    The District's failure to address this risk was unreasonable in light of the known circumstances.

143.    The District's conduct was deliberately indifferent to the substantial risk that the August 9, 2014, initiation event would also subject the female Team members to further sex-based discrimination.

144.    As a result of the District's deliberate indifference, S.A. was subjected to sex-based harassment, hazing, child abuse, harassment, bullying, cyberbullying, retaliation, and other illegal acts and conduct.

145.    The harassment S.A. suffered, as described above was so severe, pervasive, and objectively offensive that it deprived her of access to educational opportunities and benefits by creating a permanent and extremely hostile educational environment.

146.    S.A. has suffered damages and injuries as a result of the District's violations of Title IX.

## X.  FOURTH CLAIM FOR RELIEF

### (NEGLIGENCE)

### (Against All Defendants)

147.    Plaintiffs reallege and incorporate by reference each paragraph, heretofore alleged, within the body of this Complaint as though fully, herein and/or hereinafter, set forth.

148.    Defendants had a duty to comply with all applicable policies, rules, as well as federal and state laws.

149.    Defendants knew or should have known that if they did not follow applicable policies, plaintiffs would suffer damages.

150.    Defendants breached their duties to plaintiffs.  These breaches included, but are not limited to, the following:

   a.  Failing to comply with and enforce District policies on hazing;

   b.  Failing to adequately supervise, train, and hire qualified coaches or administration;

   c.  Failing to restrain peer to peer and third-party harassment;

   d.  Failing to restrain assaults and batteries;

   e.  Failing to prevent child abuse;

   f.  Failing to report child abuse;

   g.  Condoning, allowing and participating in retaliation by students, parents; staff (including Staff 1), volunteers, and other third-parties;

   h.  Failing to ensure that coaches were timely equipped with proper training certifications;

   i.  Failing to comply with OSAA Rules;  and

   j.  Failing to comply with Oregon law and allowing child abuse to occur.

151.    It was foreseeable that if any defendant breached any one of their duties, Plaintiff Parents and S.A. would suffer damages.

152.    The defendants have positions of authority and control over the families and students with whom they work.  Defendants expect that their students and families will trust their actions with regard to the students within their control.  As a result, defendants have a special relationship to Plaintiff Parents and S.A.

153.    Each breach of duty is a substantial factor in causing injuries to S.A. and Plaintiff Parents.

154.    As a direct and proximate result of the negligence outlined above, S.A. has been subjected to physical injury, pain and suffering, severe emotional distress, frustration, apprehension, trouble, uneasiness, concern, anxiety, worry, fright, panic, alarm, fear, tension, pressure, strain, stress, and loss of enjoyment of life in amounts to be proven at the time of trial.

155.    As a direct and proximate result of the negligence outlined above, S.A. has incurred and will incur in the future medical expenses and psychological expenses and other special and consequential damages, in amounts to be proven at the time of trial.  She will also incur costs to continue to take dance lessons because she is unable to do that at school.

156.    As a direct and proximate result of the negligence outlined above, Plaintiff Parents have been subjected to severe emotional distress, frustration, apprehension, trouble, uneasiness, concern, anxiety, worry, fright, panic, alarm, fear, tension, pressure, strain, stress, and loss of enjoyment of life in amounts to be proven at the time of trial.  Plaintiff Parents have also suffered economic losses in the form of lost wages as a result of defendants' conduct and negligence.

## XI.  FIFTH CLAIM FOR RELIEF

### (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

#### (Against All Defendants)

157.    Plaintiffs reallege and incorporate by reference each paragraph, heretofore alleged, within the body of this Complaint as though fully, herein and/or hereinafter, set forth.

158.    One or more of the defendants, including the District, owed a duty to plaintiffs to be vigilant in preventing hazing, assaults, harassment and/or other illegal acts directed toward and inflicted upon S.A. as a student attending Lakeridge High School.

159.    One or more of the defendants breached the alleged duties owed.

160.     One or more of the defendants, including the District, owed a duty to plaintiffs to protect plaintiffs and to protect S.A. as a student and to provide her with security within the context of a student attending high school commensurate with standards imposed on high schools within the State of Oregon and the United States of America.

161.     One or more of the defendants breached the duties owed.

162.     As a direct and proximate result of the breach of the duty of care imposed in one or more of the alleged areas, by one or more of the defendants, S.A. has been subjected to physical injury, pain and suffering, severe emotional distress, frustration, apprehension, trouble, uneasiness, concern, anxiety, worry, fright, panic, alarm, fear, tension, pressure, strain, stress, and loss of enjoyment of life in amounts to be proven at the time of trial.

163.     As a direct and proximate result of the breach of the duty of care of one or more of the defendants, S.A. has incurred and will incur in the future medical expenses and psychological expenses and other special and consequential damages, all in amounts to be proven at the time of trial.  She will also incur costs to continue to take dance lessons because she was forced off of the school dance team.

164.     As a direct and proximate result of the breach of the duty of care of one or more of the defendants, Plaintiff Parents have been subjected to severe emotional distress, frustration, apprehension, trouble, uneasiness, concern, anxiety, worry, fright, panic, alarm, fear, tension, pressure, strain, stress, and loss of enjoyment of life in amounts to be proven at the time of trial. Plaintiff Parents have also suffered economic losses in the form of lost wages as a result of defendants' conduct and negligence.

/////

/////

/////

/////

## XII.  SIXTH CLAIM FOR RELIEF

## (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

### (Against Nordlum, Schiele, and Young)

165.    Plaintiffs reallege and incorporate by reference each paragraph, heretofore alleged, within the body of this Complaint as though fully, herein and/or hereinafter, set forth.

166.    Nordlum and Young took intentional actions to harm S.A. and Plaintiff Parents as more fully described above.  The intentional actions were taken with the purpose to cause emotional distress because the actions were intended to force S.A. off the Team and to keep S.A. and her parents quiet so as to not interfere with the Team's upcoming dance competitions.  The intentional actions were taken with the purpose of frightening and stressing S.A. and her parents.

167.    Schiele took intentional actions to harm S.A. and Plaintiff Parents as more fully described above.  She told S.A. to go to a different school; she intentionally ignores and walks away from S.A. at school; she told Plaintiff Mother to file a lawsuit against her; she told Plaintiff Mother that she would have to be fired before she let anyone fire Nordlum; and she has publically apologized to the Team and the Team members' parents for the media attention but has never attempted to apologize to S.A. and her parents for the abuse, hazing, harassment, bullying, and cyberbullying.  Schiele was purposeful in her comments, actions, and inaction, intending to cause stress and anxiety for S.A. and her parents.

168.    As a direct and proximate result the intentional conduct of Nordlum, Young, and Schiele, Plaintiff Parents and S.A. have been subjected to a personal injury resulting in physical pain and suffering, severe emotional distress, mental pain and suffering, embarrassment, anxiety, and loss of enjoyment of life in amounts to be determined at the time of trial.  Plaintiff Parents have also suffered economic losses in the form of lost wages as a result of Nordlum, Young, and Schiele's intentional conduct.

/////

## XIII.  SEVENTH CLAIM FOR RELIEF

## (FALSE IMPRISONMENT)

### (Against Nordlum)

169.    Plaintiffs reallege and incorporate by reference each paragraph, heretofore alleged, within the body of this Complaint as though fully, herein and/or hereinafter, set forth.

170.    S.A. was falsely imprisoned by Nordlum when Nordlum used duct tape to lock S.A. in her room during the Team boot camp in Sunriver.

171.    Nordlum's decision to lock S.A. and other Team members into their rooms was without thought or merit and was extreme, reckless, dangerous, and outrageous.

172.    As a direct and proximate result of the false imprisonment, S.A. suffered mental pain and suffering and anxiety in an amount to be determined at trial.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for a judgment in their favor and against defendants as follows:

1.    For an Order declaring that the defendants have acted with malice or shown a reckless and outrageous indifference to a highly unreasonable risk of harm as a result of the conduct described in this Complaint and have acted with a conscious indifference to the health, safety, and welfare of others as a result of the same;

2.    For an Order declaring that the District, Beck, and Schiele, have acted with willful and wanton disregard by failing to properly train the District and high school teachers, coaches, and staff how to properly supervise and discipline students and staff who engage in hazing, child abuse, bullying, cyberbullying, and retaliation;

3.    For an Order declaring that Nordlum, Ashley, and Young, acted with willful and wanton disregard by consciously disregarding known acts of hazing;

4.    For a permanent injunction restraining and enjoining the District, Lakeridge High School, Beck, Schiele, Lamont, Nordlum, and Ashley, from failing to adequately protect S.A., and other similarly situated students, from hazing, retaliation, child abuse, bullying, and cyberbullying;

5.    For a permanent injunction ordering the District to stop engaging in unlawful acts, and to develop strict policies and procedures for ending any such unlawful acts and the hostile, retaliatory, and unsafe environment, including but not limited to the following:

a.    Require the District to implement mandatory and effective training programs with measurable results for District faculty, staff, coaches, volunteers, and students on issues relating to hazing, bullying, cyberbullying, and retaliation together with any methods to intervene to stop students and volunteers from hazing/bullying other students and their families;

b.    Require the District to adopt policies with specific guidelines for instructing teachers, coaches, staff, volunteers, and other District employees about how to address observed and unobserved acts of hazing, harassment, child abuse, bullying, cyberbullying, and retaliation;

c.    Require the District to conduct assemblies for all students in the District addressing issues of hazing, bullying, and cyberbullying, wherein students are instructed about laws prohibiting such conduct, including but not limited hazing, harassment, child abuse, bullying, cyberbullying, and retaliation, as well as the detrimental social and psychological effects such behavior has on students' lives;

d.    Require the District to conduct educational sessions wherein all staff, students, their parents, and volunteers are instructed about laws prohibiting hazing, harassment, child abuse, bullying, cyberbullying, and retaliation and how such conduct impinges on students' freedom of speech and interferes with students' right to an education free from abuse and harassment;

      e.      Require the District to assign a peer mediator and/or other staff member to District schools to provide active monitoring for the schools and to address instances hazing, harassment, child abuse, bullying, cyberbullying, and retaliation that arise at the schools;

      f.      Require the District to maintain statistical data concerning each complaint of the impingement of freedom of speech, hazing, bullying, child abuse, cyberbullying, or retaliation made by a student, parent, or staff member, as well as the specific action District personnel took to resolve the complaint;

      g.      Prevent Young from serving as a volunteer at any school in the District; and

      h.      Prevent Nordlum and Ashley from serving as a volunteer, coach, teacher, or agent at any school in the District.

6.      For general damages, including interest, according to proof;

7.      For punitive damages;

8.      For plaintiffs' attorneys' fees and costs incurred herein pursuant to 42 U.S.C. § 1988;

9.      For any and all allowable statutory damages;

10.      For all appropriate declaratory and equitable relief; and

11.      For all such other relief as is just and necessary under the circumstances.

/////

/////

/////

/////

/////

/////

/////

## XV.  DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial.

Dated this 10th day of September, 2015.

JORDAN RAMIS PC


By: *s/ Leta E. Gorman*
      **LETA E. GORMAN,**
      OSB # 984015
      **DIANE LENKOWSKY**,
      OSB # 143725
      Two Centerpointe Dr 6th Flr
      Lake Oswego OR 97035
      Telephone:  (503) 598-7070
      leta.gorman@jordanramis.com
      diane.lenkowsky@jordanramis.com

**Attorneys for Plaintiffs**

**CERTIFICATE OF SERVICE**

I hereby certify that on the date shown below, I served a true and correct copy of the

foregoing THIRD AMENDED COMPLAINT on:

Lucas W. Reese
Garrett Hemann Robertson PC
1011 Commercial St NE
Salem OR 97301
Facsimile:  (503) 581-5891
E-mail:  lreese@ghrlawyers.com
    Attorneys for Defendants Kayla Nordlum
    and Ashley Nordlum

Karen M. Vickers
Blake H. Fry
Mersereau Shannon LLP
1 SW Columbia St Ste 1600
Portland OR 97258
Facsimile:  (503) 226-0383
E-mail:  kvickers@mershanlaw.com
E-mail: bfry@mershanlaw.com
    Attorneys for Defendants Lake
    Oswego School District, Jennifer
    Schiele, Ian Lamont, and Heather
    Beck

Matthew A. Levin
J. Matthew Donohue
Kristin Asai
Markowitz Herbold PC
1211 SW 5th Ave Ste 3000
Portland OR 97204
Facsimile:  (503) 323-9105
E-mail: mattlevin@markowitzherbold.com
E-mail: mattdonohue@markowitzherbold.com
E-mail: kristinasai@markowitzherbold.com
    Attorneys for Defendant Suzanne Young

Robert D. Scholz
Christopher B. Marks
MacMillan Scholz & Marks PC
900 SW Fifth Ave Ste 1800
Portland OR 97204
Facsimile:  (503) 224-0348
E-mail:  rscholz@msmlegal.com
E-mail:  cmarks@msmlegal.com
    Attorneys for Defendant Suzanne
    Young

☐    by first class mail, postage prepaid.

☐    by hand delivery.

☐    by facsimile transmission.

☐    by facsimile transmission and first class mail, postage prepaid.

☐    by electronic transmission.

☒    by electronic transmission and first class mail, postage prepaid.

DATED:  September 10, 2015.

*s/ Leta E. Gorman*
Leta E. Gorman, OSB # 984015
Diane Lenkowsky, OSB # 143725
Attorneys for Plaintiffs