**Leta E. Gorman, OSB #984015**
E-Mail: lgorman@bpmlaw.com
**Jeffrey M. Dore,** *Pro Hac Vice*
E-Mail: jdore@bpmlaw.com
Betts, Patterson & Mines, P.S.
111 SW 5th Avenue, Suite 3650
Portland, OR 97204
Telephone:     (503) 961-6338
Facsimile:      (503) 961-6339

*Attorneys for Plaintiffs Achcar-Winkels*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| TAISSA AND RAY ACHCAR-WINKELS, Individually and as Parents and Next Friends of S.A., a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>LAKE OSWEGO SCHOOL DISTRICT; an Oregon municipal corporation; HEATHER BECK, an individual; JENNIFER SCHIELE, an individual; IAN LAMONT, an individual; KAYLA NORDLUM, an individual; ASHLEY NORDLUM, an individual; SUZANNE YOUNG, an individual<br><br>Defendants. | NO.  3:15-cv-00385-MO<br><br>PLAINTIFFS' TRIAL MEMORANDUM |

## I.     INTRODUCTION

Plaintiffs Taissa and Ray Achcar-Winkels and S.A., a minor, (hereafter "Plaintiffs") respectfully submit the following Trial Memorandum describing the relevant facts, issues and law in the above-referenced matter.

Page 1 – PLAINTIFFS' TRIAL MEMORANDUM

## II.    CASE SUMMARY

The Third Amended Complaint ("TAC") filed by Plaintiffs includes an extensive factual history of the events that give rise to this lawsuit (*see*, TAC (Dkt. #061) ¶ 42-113) so, for efficiency's sake, we will not repeat the long list of factual allegations here.    More generally, this case arises from the hazing and resultant harassment, retaliation, cyberbullying, bullying of S.A. and her parents by the Defendants and those the Defendants were charged with supervising.    The hazing was followed by the Defendants' nearly complete lack of adherence to district policies, Oregon law, federal law, and the high school's own policies requiring investigation of the events alleged by S.A. and which were created to protect students and parents such as S.A. and her parents from this exact type of behavior.

The Defendants created an atmosphere of fear and intimidation that led to significant harm to a student and family whose only "transgression" was reporting plainly wrongful behavior to the adults in charge of the student's supervision and education.    As a result of her righteous action, she and her parents have been and continue to be harassed for the last three years high school career and her entire family has been damaged and degraded in their community.    The following is but a short summary of the events that created the circumstances giving rise to this lawsuit.

In the summer of 2014, S.A. was 14 years old and about to enter her freshman year of high school at Lakeridge High School ("LHS").    In May of 2014, S.A. successfully tried out for the Pacer Dance Team ("PDT") at LHS.    S.A. worked hard on her dancing abilities through long hours of practice and lessons over many years and was a member of the Junior Pacer Dance Team ("JPDT") at Lakeridge Junior High School ("LJHS") for the two years leading up to this tryout.    Upon learning that she had earned a spot on the team, S.A. was overjoyed and her parents, Taissa Achcar-Winkels ("Taissa") and Ray Achcar-Winkels ("Ray") were extremely proud of her accomplishment.

Page 2 – PLAINTIFFS' TRIAL
MEMORANDUM

PDT practice began in June of 2014 and carried on throughout the summer in preparation for the dance competitions and performances that would take place throughout the 2014-2015 school year.  In June and August of 2014, the PDT engaged in multiple "team bonding activities".  That term is in quotes because these activities, instead of creating friendship and trust for the team, actually ended up turning into hazing events and inappropriate interactions that destroyed at least one girl's entire high school experience.  The events that took place during these team bonding activities involved being forced to reveal intimate details of one's personal life in front of the team, being abandoned on the side of a road by her team and her coach, being lied to, assaulted, and forced to engage in risky and criminal behavior, and being humiliated in front of a large group of students.  When S.A. reported this behavior in August of 2014, she was ostracized, harassed, retaliated against, bullied and eventually forced to remove herself from the PDT.

The PDT head coach, Kayla Nordlum ("Kayla") and PDT assistant coach (and sister) Ashley Nordlum ("Ashley") created an atmosphere of fear and intimidation that would have prevented any person from coming forward in the future with reports of improper treatment or to even confirm the facts that were reported by others.  LHS athletic director Ian Lamont ("Lamont") and LHS Principal Jennifer Schiele ("Schiele") failed to investigate S.A.'s allegations despite Lake Oswego School District ("LOSD") policy requiring them to investigate.  LOSD Superintendent Heather Beck ("Beck") also failed to investigate after being informed of the events in August of 2014.  Finally, Suzanne Young ("Young"), the PDT team manager and CFO, took it upon herself to harass and insult Plaintiffs via social media (including the use of racially insensitive postings) and by spreading false rumors in an attempt to publicly degrade and discredit the Plaintiffs.

By failing to investigate or discipline any of the people involved in the hazing event or the subsequent failure to properly manage the situation, LOSD and the other defendants created

Page 3 – PLAINTIFFS' TRIAL
MEMORANDUM

an atmosphere where intimidation and bullying were rewarded and honesty and forthrightness was discouraged and disregarded. The Kayla violated S.A.'s 1st amendment rights, the Defendants' negligence caused injuries (both physical and emotional) to Plaintiffs, and one of the Defendants, Kayla, intentionally harmed S.A. emotionally and actually confined S.A. in a bedroom while S.A. was under Kayla's supervision during a PDT event. For all of those reasons, and following months of attempting to get the Defendants to adequately address the situation before resorting to litigation, Plaintiffs were forced to file this lawsuit.

## III.    PROCEDURAL HISTORY

After spending months attempting to resolve the issues giving rise to this lawsuit informally with the Defendants, Plaintiffs felt the only way to adequately resolve this matter was through litigation. On March 9, 2017 Plaintiffs filed the original complaint in this matter and the TAC (the operative complaint) was filed on September 10, 2015. The Defendants filed motions for summary judgment against the TAC on December 23, 2015. After the motion was heard by this Court and ruled upon, the remaining claims against the Defendants include the following: (1) a 42 U.S.C. §1983 claim for the violation of S.A.'s First Amendment rights against Kayla; (2) claims of negligence against LOSD, Lamont, Schiele, Beck, and Young by Taissa and Ray; (3) a claim of Intentional Infliction of Emotional Distress by S.A. against Kayla; and (4) a claim of False Imprisonment by S.A. against Kayla. Additionally this Court ruled that LOSD could not be substituted for the individually named defendants and that Plaintiffs could present evidence related to punitive damages as described in the TAC.

## IV.    CLAIMS AND ARGUMENTS

## A.    Violation of S.A.'s First Amendment Rights per 42 U.S.C. §1983 (S.A. Against Kayla)

The First Amendment to the United States Constitution, as applied to the States by the Fourteenth Amendment to the United States Constitution, guarantees the right to freedom of

speech. The First Amendment states: "Congress shall make no law * * * abridging the freedom of speech." 42 U.S.C. §1983 states the following:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

A person acts under the color of state law when that person represents the state in some capacity, whether they act in accordance with their authority <u>or</u> misuse it. *Monroe v. Pape,* 365 US 167, 81 S.Ct. 473 (1961). Further, local officials have been found to have been acting under color of law when that official is "clothed with the authority of state law." *Delcambre v. Delcambre*, 635 F.2d 407, 408 (5th cir.1981)(per curiam). For the trier of fact to find that Kayla deprived S.A. of her First Amendment rights under §1983, S.A. must prove, by a preponderance of the evidence, the following:

1.    S.A. and/or her mother, Taissa were engaged in a constitutionally protected activity;

2.    Kayla's actions against plaintiff S.A. would chill a person of ordinary firmness from continuing to engage in the protected activity; and

3.    S.A.'s (and/or Taissa's) protected activity was a substantial or motivating factor in defendant Kayla's conduct.

Page 5 – PLAINTIFFS' TRIAL
MEMORANDUM

The trier of fact must consider that S.A. was a child at the time of the events giving rise to this lawsuit. The courts have recognized that, "there are few associational rights more intimate and fundamental than the right of a minor child to associate with his parents who are engaged in protective speech." *Cain v. Tigard-Tualatin School Dist. 23J*, 262 F.Supp.2d 1120, 1127 (D.Or.,2003). Therefore, the a person of ordinary firmness in this case would be a child about to enter high school and faced with the choice of remaining silent or reporting the hazing activities of older students.

The First Amendment protects not only S.A.'s speech, but also the speech of S.A.'s parents Taissa and Ray when they are speaking on her behalf. Even if Kayla's intimidating conduct successfully inhibited S.A.'s speech or that of Taissa or Ray, it is a First Amendment violation. *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir.1999). Further, the infringement alleged by S.A. need not be particularly great in order to find that her rights have been violated by Kayla. *Elrod v. Burns*, 427 U.S. 347, 359 n. 13, 96 S.Ct. 2673 (1976).

There have been numerous cases that have addressed the infringement upon a student's First Amendment rights while that student is in a public school setting. The case law makes it clear that if a violation of §1983 takes place, it can only be excused when the state actor infringing upon the student's rights can show that there was a reasonable belief and reasonable forecast that the constitutionally protected activity being restricted would cause a substantial disruption or materially interfere with school activities. *Tinker v. Des Moines Ind. Comm. Sch. Dist.*, 393 US 503, 89 S Ct 733, 21 L Ed 2d 731 (1969). In the *Tinker* case, the court found that students wearing black armbands in protest of the Vietnam War did not create the type of disruption necessary to justify a restriction of their free speech rights. Even more on point is the *Pinard* case in which the court found that a basketball team protesting a coach's verbal

abuse and signing a petition to detail the abuse and demand that he be fired was not sufficient to justify disciplinary action. *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F3d 755 (9th Cir 2006). In *Pinard*, it was only when the team threatened to boycott a basketball game and actually followed through on their threat that the court found that disciplinary action was allowed.

Here, S.A. reported being hazed and other inappropriate behaviors by members of the PDT and Kayla to her parents (Taissa and Ray) and Lily Schauffler ("Schauffler") (PDT's technique coach). Taissa and Ray then confirmed these reports to Lamont once LS passed on S.A.'s report to him shortly after receiving it from S.A. S.A.'s report of these activities is constitutionally protected speech under the definition in the First Amendment. KAYLA, once informed that a report of hazing was made, interrogated the PDT members during the team's Sunriver retreat and she told S.A. that she is never to speak about initiation again. She continued to pursue the identity of the person who made the report and once she discovered that S.A. was the child who reported the hazing and that Taissa was confirming S.A.'s report, Kayla threatened to suspend S.A. if Taissa did not cease in discussing the hazing event with the administration and the other parents. This threat is documented in an e-mail dated August 29, 2014. Going even further, Kayla singled out S.A. for undeserved criticism and in one specific incident forced S.A. to stand on the sideline alone while the other dancers were doing cheers at a football game as punishment for supposedly S.A's inability to properly perform the routine despite evidence that S.A. was not receiving low marks in the objective scoring system employed by the PDT to track each dancer's progress. This humiliating retaliatory action by Kayla is something the former PDT coach, Brooke Mattern, said had never been done in PDT's history.

S.A.'s report of hazing was protected speech. Being threatened with suspension from the team is an action that would chill a child of ordinary firmness who was about to enter high school from reporting inappropriate behaviors of her coach and teammates. And finally, Kayla

Page 7 – PLAINTIFFS' TRIAL
MEMORANDUM

made her motivation for her retaliatory actions clear by sending an e-mail to Taissa threatening the retaliatory action if Taissa and S.A. did not cease in engaging in their protected speech. Kayla's activities meet all the elements for a §1983 claim.

**B.    Negligence**

For each of the below claims of negligence, the Plaintiffs must prove the following by a preponderance of the evidence:

1.    The defendants' conduct was negligent;

2.    The defendants' negligent conduct was a cause of harm to the plaintiffs; and,

3.    The harm was reasonably foreseeable.

The law requires that every person use reasonable care to avoid harming others. *Kirby v. Sonville*, 286 Or 339, 594 P2d 818 (1979). Reasonable care is the degree of care and judgment used by reasonably careful people in the management of their own affairs to avoid harming themselves or others. A person fails to use reasonable care when that person does something that a reasonably careful person would not do, or fails to do something that a reasonably careful person would do under similar circumstances. *Id.* A person is liable only for the reasonably foreseeable consequences of his or her actions. *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987).

A defendant's conduct is a cause of a plaintiff's injury if the injury would not have occurred but for that conduct; conversely, the defendants' conduct is not a cause of the plaintiffs' injury if that injury would have occurred without that conduct. *Joshi v. Providence Health Sys. of Oregon Corp.*, 342 Or 152, 149 P.3d 1164 (2006)    For a consequence to be foreseeable two things must be true: (1) the plaintiffs must be within the general class of persons that one reasonably would anticipate might be threatened by the defendants' conduct

and (2) the harm suffered must be within the general class of harms that one reasonably would anticipate might result from the defendants' conduct. *Id.*

### 1.    S.A. (Against all Defendants)

A duty to prevent foreseeable harm is created when there is a "special relationship" between the parties. The existence of a special relationship is "driven by the facts" of the particular case. *Shin v. Sunriver Preparatory Sch., Inc.*, 111 P.3d 762, 770 (Or. App. 2005). The Oregon Supreme Court recognized a special "duty of supervision" imposed upon schools as far back as 1987. *Fazzolari* at 1337. Schools have "a special duty arising from the relationship between educators and children entrusted to their care apart from any general responsibility not unreasonably to expose people to a foreseeable risk of harm." Id. The degree of control is often a deciding factor in whether there is a special relationship between the parties and the courts have noted that the, "vast majority of students are minors, and school personnel assume a great deal of authority over their conduct during the school day." *Conway v. Pac. Univ.*, 924 P.2d 818, 824 (Or. 1996).

A plaintiff who seeks damages for emotional harm may generally do so only where the harm is tied to a physical injury. *Tomlinson v. Metro. Pediatrics, LLC*, 366 P.3d 370 (Or. App. 2015). Emotional damages may be available when a defendant acts intentionally or "causes foreseeable, serious emotional distress and also infringes some other legally protected interest." *Philibert v. Kluser*, 385 P.3d 1038 (Or. 2016). A legally protected interest is an independent basis of liability separate from the general duty to avoid foreseeable risk of harm." *Id.* at 1042. Here, S.A. was physically injured when she was bruised by the water balloons that were thrown at her during the hazing/initiation. She also was hurt when she was forced to wrestle with other PDT initiates and suffered cuts to her feet when she was forced to run barefoot across gravel.

The Defendants should have foreseen and prevented the abusive activities that transpired during the PDT's August 2014 initiation and the retaliation that followed S.A.'s

report of those activities.  The Defendants were aware of a "tradition" of PDT "initiations" involving younger PDT members as early as 2007.  They knew these activities were conducted by the older PDT members and that the activities of this particular initiation would take place, at least in part, on LOSD property.  The Defendants had a "special relationship" with S.A. as representatives of the school district and in particular because they were entrusted with the care of a child.  Prior to the hazing, Taissa expressed her concern with the potential activities that might take place at the event and confirmed with Kayla that S.A. would be allowed to keep her cell phone on her at all times.  S.A.'s cell phone was taken from her almost immediately when she arrived at the event.  Kayla told all of the parents that the PDT would be engaging in harmless games at LJHS when in fact the team would actually be engaged in abusive activities at LHS.  She also told parents she would be there and that the hostess (a PDT mother) would be chaperoning the events.  When her plans changed, Kayla did not find a replacement.  And, Kayla did nothing to ensure that the chaperone would actually chaperone.  This supervisory lapse caused a preventable harm.

Kayla and the other Defendants may argue that they should be able to rely upon others to obey the law and that they cannot be liable for the unlawful actions of others.  Every person has a right to assume that others will obey the law, however, <u>unless and until</u> that person knows or in the exercise of reasonable care should know otherwise.  *Smith v. Holst*, 275 Or 29, 33, 549 P2d 671 (1976).  There is a limitation placed on this right when the "others" being considered are children.  Adults must anticipate the ordinary behavior of children when making assumptions about their expected behavior.  *Simmons v. Holm*, 229 Or. 373, 403–05, 367 P.2d 368 (1961).  The "others" in this case were with PDT seniors leading the hazing.  Although there may be a general right to assume others will obey the law, the Defendants cannot rely upon that right when they had knowledge of the PDT's lengthy initiation history, when the

Page 10 – PLAINTIFFS' TRIAL
MEMORANDUM

PDT is led by teenagers, and when concerns about the event were expressed by parents prior to the event.

After S.A. reported the event to the administration, her parents expressed their concern to the administration that should the PDT and Kayla discover the identity of S.A. as the person that reported the event, that S.A. would be retaliated against. Lamont and Schiele used this fear to convince Taissa and Ray that it would be in S.A.'s best interest that they not investigate or make a big deal about the hazing. Taissa and Ray, whose primary concern was their daughter's well-being, agreed to follow the administrators' lead in the hopes that their daughter would be protected from retaliation, but Taissa and Ray made it clear that they wanted action taken to prevent this type of activity from occurring in the future. The administrators did not investigate despite district policies requiring investigation and disciplinary action to be taken if the reports of hazing were found to be true. The administrators' only concrete action was to read an anti-hazing policy statement to each team beginning their season in the fall of 2014.

After the report of hazing, it became clear almost immediately that Kayla and the rest of the PDT (and subsequently many others in the LHS student body and Lake Oswego community at large) would engage in retaliatory actions against S.A. S.A. was threatened with suspension by Kayla if her and Taissa did not stop discussing the hazing. S.A. was picked on at dance practice by Kayla and Ashley and given lower dance scores than her previous scoring history would suggest was due to performance. The PDT seniors (those responsible for the hazing) clearly isolated S.A. from the rest of the team and their behavior was condoned and likely encouraged by Kayla and Ashley. Additionally, Lamont and Schiele's lack of investigation and subsequent actions toward the PDT (such as apologizing to the PDT for having people criticizing their behavior or publicly praising their character) created an atmosphere where there were no consequences for retaliatory actions taken against S.A. Schiele, who was in

Page 11 – PLAINTIFFS' TRIAL
MEMORANDUM

charge of S.A.'s education made no attempt to address the situation to prevent the PDT and others in the student body from bullying S.A.

Young was the PDT team manager and CFO and oversaw the finances and public relations of the PDT. She made many public comments questioning S.A.'s honesty (or the honesty of those reporting the hazing) and made public claims that the hazing did not occur as reported. Those comments damaged S.A.'s reputation in her community and S.A. suffered as a result. She was called a liar and a snitch – she still is. She was forced to live in a community in which Young repeatedly questioned her integrity and insulted her family. Young's actions were inexcusable for an adult who was in a position of authority over school children. She abused her position in the community to degrade and humiliate S.A. and her family.

The Defendants breached their duty to S.A. when they allowed a hazing to take place and subsequently failed to investigate the report of hazing and protect S.A. from bullying, harassment and retaliation by the PDT and other students. That breach caused physical and emotional harm to S.A. That harm was foreseeable because the Defendants knew of the PDT's long history of hazing and S.A.'s parents were warned by the Defendants that should S.A.'s identity become known that she could be ostracized by the PDT and other students.

### 2. Taissa and Ray (Against LOSD and Young)

The elements of S.A.'s parents negligence claim are the same as for S.A.'s claim. The same case law applies and the same standard applies. The above-referenced defendants breached their duties to S.A. and her parents in multiple ways that include, but are not limited to the following:

> a. Failing to comply with and enforce District policies on hazing;
>
> b. Failing to adequately supervise, train, and hire qualified coaches or administration;
>
> c. Failing to restrain peer to peer and third-party harassment;

Page 12 – PLAINTIFFS' TRIAL
MEMORANDUM

    d.   Failing to restrain assaults and batteries;

    e.   Failing to prevent child abuse;

    f.   Failing to report child abuse;

    g.   Condoning, allowing and participating in retaliation by students, parents; staff,  volunteers, and other third-parties;

    h.   Failing to ensure that coaches were timely equipped with proper training certifications;

    i.   Failing to follow LHS policies;

    j.   Failing to comply with OSAA Rules; and

    k.   Failing to comply with Oregon law and allowing child abuse to occur.

Taissa and Ray suffered severe emotional distress, frustration, apprehension, trouble, uneasiness, concern, anxiety, worry, fright, panic, alarm, fear, tension, pressure, strain, stress, and loss of enjoyment of life in amounts to be proven at the time of trial.  Ray has also suffered economic losses in the form of lost wages as a result of defendants' conduct and negligence. As parents, Taissa and Ray are responsible for S.A.'s well-being; therefore, Taissa and Ray had a legally protected interest in their daughter's safety and security when their daughter was under the supervision and authority of the school and its agents (the Defendants).  Taissa and Ray entrusted S.A. to Defendants and relied upon their competence and performance and consequently, gave Defendants responsibility and control over S.A.  They relied upon the presumed adherence to LOSD policies and the presumption that no criminal statutes would be violated.  Here, Defendants failed to adhere to the hazing policies and allowed S.A. to be hazed, bullied and retaliated against while under their care and control.

"Where an independent basis of liability exists, irrespective of whether there existed physical injuries, recovery has been uniformly allowed for mental suffering and anguish."

*Macca v. Gen. Telephone Co. of N.W.*, 262 Or. 414, 418, 495 P.2d 1193 (1972).  Defendants breached multiple independent duties created by statute when they allowed S.A. to be hazed and subsequently retaliated against while under their care and control.   ORS 163.197 (the Oregon Statute prohibiting hazing) states the following (relevant portions underlined for emphasis):

(1) A student organization or a member of a student organization commits the offense of hazing if, as a condition or precondition of attaining membership in the organization or of attaining any office or status in the organization, the organization or member intentionally hazes any member, potential member or person pledged to be a member of the organization.

(2) (a) A student organization that violates subsection (1) of this section commits a Class A violation.

(b) A member of a student organization who personally violates subsection (1) of this section commits a Class B violation.

(3) Consent of the person who is hazed is not a defense in a prosecution under this section.

(4) As used in this section:

(a) "Haze" means:

(A) To subject an individual to whipping, beating, striking, branding or electronic shocking, to place a harmful substance on an individual's body or to subject an individual to other similar forms of physical brutality;

(B) To subject an individual to sleep deprivation, exposure to the elements, confinement in a small space or other similar activity that subjects the individual to an unreasonable risk of harm or adversely affects the physical health or safety of the individual;

(C) To compel an individual to consume food, liquid, alcohol, controlled substances or other substances that subject the individual to an unreasonable risk of harm or adversely affect the physical health or safety of the individual; or

Page 14 – PLAINTIFFS' TRIAL MEMORANDUM

(D) <u>To induce, cause or require an individual to perform a duty or task that involves the commission of a crime or an act of hazing.</u>

(b) "<u>Member</u>" <u>includes volunteers, coaches and faculty advisers of a student organization.</u>

(c) "Student organization" means a fraternity, sorority, <u>athletic team or other organization that is organized or operating on a college, university or elementary or secondary school campus for the purpose of providing members an opportunity to participate in student activities of the college, university or elementary or secondary school.</u>

ORS 339.362 (the Oregon statute prohibiting retaliation) states the following:

(1) A school employee, student or volunteer may not engage in reprisal or retaliation against a victim of, witness to or person with reliable information about an act of harassment, intimidation or bullying or an act of cyberbullying.

(2) (a) A school employee who witnesses or has reliable information that a student has been subjected to an act of harassment, intimidation or bullying or an act of cyberbullying must report the act to the appropriate school official designated by the school district's policy.

(b) A student or volunteer who witnesses or has reliable information that a student has been subjected to an act of harassment, intimidation or bullying or an act of cyberbullying is encouraged to report the act to the appropriate school official designated by the school district's policy.

(3) A school employee who promptly reports an act of harassment, intimidation or bullying or an act of cyberbullying to the appropriate school official in compliance with the procedures set forth in the school district's policy is immune from a cause of action for damages arising from any failure to remedy the reported act.

In addition to the statutorily created duties breached by the Defendants, the Defendants failed to adhere to LOSD policies upon which Taissa and Ray relied when placing their child under the care and control of the Defendants.  Those policies define the standard of care and

required judgment for LOSD employees and agents and "establish a custom representing the common judgment concerning the risks of a particular situation and the precautions required to meet them." RESTATEMENT (SECOND) OF TORTS § 295A cmt. b (1964).    Additionally, "company work rules, while not controlling, are admissible to demonstrate what the company's employees should have done in a particular situation." *White v. Metro. Gov't of Nashville & Davidson Cty.,* 860 S.W.2d 49, 52 (Tenn. Ct. App. 1993) (citing 3 Fowler V. Harper, *et al.*, *The Law of Torts* § 17.3 at 587 (2d ed. 1986); Fleming James, Jr. & David K. Sigerson, *Particularizing Standards of Conduct in Negligence Trials,* 5 Vand. L. Rev. 697, 712-13 (1952); *Petriello v. Kalman*, 215 Conn. 377, 576 A.2d 474, 479 (1990)).    Relevant LOSD policies at issue in this case include, but are not limited to:

      (1)    Volunteers;

      (2)    Guidelines for Classroom and School Site Observation of Students;

      (3)    Sexual Harassment;

      (4)    Student Rights and Responsibilities;

      (5)    Hazing/Harassment/Intimidation/Bulling/Menacing/Cyberbullying/Teen Dating Violence;

      (6)    Threats of Violence;

      (7)    Coaching Expectations (which incorporate OSAA rules);

      (8)    Interscholastic Athletics (which incorporate OSAA rules);

      (9)    Reporting of Suspected Abuse of a Child;

      (10)    Student Safety;

      (11)    Student Use or Possession of Alcohol and Drugs;

      (12)    Threats of Violence;

      (13)    Student Transportation in Private Vehicle; and

      (14)    Staff Ethics.

Page 16 – PLAINTIFFS' TRIAL
MEMORANDUM

As noted above, parents entrust their child's safety to schools. There are policies (as described above) intended to provide comfort and assurances to parents about their child's safety. There are laws (such as those stated above) that create statutory duties and independent legal interests for parents entrusting their children to care and control of schools. When the Defendants failed to follow their own policies and allowed statutory violations to occur while S.A. was under their supervision, they breached independent duties to prevent foreseeable harm to Taissa and Ray's legally protected interest in S.A.'s safety and well-being. When a parent trusts a school to protect their child and the school does not, the impact on parents can be severe. Therefore, damages for emotional distress are appropriate and available as a result of the Defendants negligence.

Taissa and Ray were repeatedly attacked by Young via public statements and social media postings. Young posted racially insulting messages directed at Taissa on her Facebook page and sent harassing text messages to Taissa. She publicly called Taissa, Ray and S.A. liars with the intent of destroying the Plaintiffs' credibility within the Lake Oswego community and went so far as to threaten to damage Taissa and Ray's car. Young's actions resulted in significant harm that was foreseeable and fell below the standard of reasonable care that the law requires every person to use to avoid harming others.

## C.    Intentional Infliction of Emotional Distress (S.A. Against Kayla)

In order to prove a claim for Intentional Infliction of Emotional Distress ("IIED") a plaintiff must prove that (1) the defendant intended to cause the plaintiff severe emotional distress, (2) the defendant's conduct was outrageous, *i.e.*, extraordinarily beyond the bounds of socially tolerable conduct, and (3) the defendant's conduct actually caused the plaintiff's severe emotional distress. *McGanty v. Staudenraus*, 321 Or 532, 545–51, 901 P2d 841 (1995) (adopting Restatement (Second) of Torts §§8A, 46). Emotional distress includes mental

suffering, mental anguish, mental or nervous shock, fright, and all highly unpleasant mental or emotional reactions. *Checkley v. Boyd*, 170 Or App 721, 742−43, 14 P3d 81 (2000). The severity, intensity and duration of the emotional distress are considered; the emotional distress must be substantial or enduring, and not mild or transitory. *Williams v. Tri-County Metropolitan Transp. Dist. of Oregon*, 153 Or App 686, 690, 958 P2d 202 (1998). Intent is determined by considering whether the defendant desired to cause the consequences of her actions or believed that the consequences were substantially certain to result from her actions. *McGanty* at 549-51.

Kayla took intentional actions to harm S.A. and those intentional actions were taken for the purpose of causing emotional distress. Kayla's actions forced S.A. to resign from the PDT. Kayla interrogated S.A. in front of other PDT team members, Kayla gave S.A. lower dance grades than S.A.'s performance warranted, Kayla singled out S.A. for criticism during practices, Kayla questioned S.A.'s honesty about the hazing event by repeatedly referring to the people reporting the event as liars, and finally, Kayla singled S.A. out during a football game by forcing her to stand on the sideline while the balance of the PDT performed a dance routine on the field. Kayla created hostile environment that gave permission to the other PDT dancers to single out S.A., bully S.A., and ruin what should have been a great experience for an incoming freshman high school student.

Kayla's actions resulted in terrible and foreseeable consequences. S.A. has been labeled a liar and a snitch by her peers, she has been insulted and bullied for the better part of over 3 years, and she missed out on being a part of a dance team for which she worked hard to become a member. Kayla's actions were intentional and for the purpose of maintaining her position and eliminating the potential for punishment for the other dancers (which would have hurt the PDT's competitive chances at its upcoming competitions). Kayla was acutely aware (as a former high school dance team member) that her actions would have a severe negative

Page 18 – PLAINTIFFS' TRIAL MEMORANDUM

impact on S.A. and she placed the PDT's chances of winning above S.A.'s well-being.  Kayla's actions took place over a month long period of time and were constant during PDT's lengthy and frequent practices.  Kayla's actions, statements and writings make it clear that she intended for her actions to make being a part of PDT unpleasant for S.A.  Every element of the claim for IIED is met by Kayla's unambiguous actions.

**D.**    **False Imprisonment (S.A. Against Kayla)**

To prove a claim of false imprisonment against Kayla, S.A must prove the following:

1.    Kayla confined S.A.;

2.    Kayla intended to confine S.A.;

3.    S.A. was aware of the confinement; and

4.    The confinement was unlawful.

*Ross by & Through Ross v. City of Eugene*, 151 Or App 656, 950 P2d 372 (1997) and *Hiber v. Creditors Collection Serv., Inc.*, 154 Or App 408, 961 P2d 898 (1997).

Additionally, S.A.'s imprisonment need only have been for a short amount of time. *Lukas v. J.C. Penney Co.*, 233 Or. 345, 353, 378 P.2d 717 (1963).  Kayla may argue that S.A. consented to her confinement, or that Taissa and Ray consented to their daughter's confinement; however, submission to a threat of force or to reasonably apprehended force, such as a threat to be kicked off the PDT in this case, is not to be considered as consent to the restraint.  *Roberts v. Coleman*, 228 Or 286 (1961).

S.A. was with the PDT on a trip to Sunriver, Oregon shortly after the hazing incident. Kayla had been informed by Lamont prior to this trip that hazing at the PDT initiation had been reported and Taissa had informed Kayla that the girls had played inappropriate games after the coaches went to sleep during the Gearhart, Oregon trip the prior  month.  Kayla decided that in order to prevent these types of activities, she would duct tape the PDT dancers' bedroom doors shut.  The girls were assigned to sleep in groups of four or five in each bedroom of the house

the PDT had rented.  Kayla then told the dancers that she would be duct taping their doors shut and that there would be severe consequences for any dancer found outside of their room after curfew.  Kayla only informed the dancers' parents of this restraint in an e-mail the next day. Once informed, many parents communicated their concerns with this practice via phone calls and text messages.  As a result, Kayla did not duct tape the doors shut any of the subsequent nights.

S.A. was confined in her bedroom through the use of duct tape on the doors and the threat of force or consequences by Kayla.  Kayla's express intention was to confine S.A. and the other dancers to their bedrooms for the night.  S.A. was expressly told that this was Kayla's intent and actually knew that the doors had been duct taped shut.  Finally, the confinement was unlawful because S.A. did not give her consent and neither did S.A.'s parents.

## V.    EXPERT TESTIMONY

Plaintiffs will provide expert testimony from three experts during the course of this trial. Dr. Andrew Nanton (a medical expert) will testify regarding the emotional and psychological impacts the events giving rise to this lawsuit.  He will testify that S.A.'s reactions were those of a healthy adolescent and that S.A. would likely have continued to be a part of the PDT were it not for Defendants actions.   Additionally, he will testify that the implicit threat of similar targeting would have discouraged others from associating with S.A.  This treatment will likely lead to lasting perceptions of inadequacy in S.A. and the distress of watching their daughter be the subject of ridicule and scorn would have significant impact on Taissa and Ray.

Dr. Harold Hinsley ( a school administration expert) will testify that, "there is no doubt that hazing and bullying," took place.  That LOSD (and its agents) failed to investigate the hazing and bullying despite being required to do so by the LOSD policies and the State of Oregon.   He will testify that Kayla failed to demonstrate mature judgment and that no administrator followed the laws of the State of Oregon requiring specific actions after a report

Page 20 – PLAINTIFFS' TRIAL
MEMORANDUM

of hazing.   Raymond (Chip) Salvestrini (Athletic department expert) will testify that the Defendants violated the normal standards of the industry.  He will opine that Schiele, Lamont, and Beck failed to provide a safe environment for S.A. despite being required to do so and that the Defendants were negligent in permitting and allowing events to transpire that caused the hazing and bullying of S.A. and her family.  He will also testify that the failure of the school administrators to follow the school board's policy was clearly the proximate and actual cause of the hazing, bullying and retaliation experienced by S.A.

## VI.    DAMAGES

Plaintiffs provided the Court with Plaintiffs' Itemized List of Special Damages that are an accurate accounting of the economic damages suffered by Plaintiffs as a result of the defendants actions.  In addition to the economic damages enumerated in the above-referenced list, Plaintiffs will provide the jury with evidence of the nature and extent of their injuries including but not limited to the following:

(1)    The loss of enjoyment of life experienced;

(2)    The mental, physical, and/or emotion pain and suffering experienced and that with reasonable probability will be experienced in the future; and

(3)    The reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future.

In addition to the economic and non-economic damages available for all claims, punitive damages should be awarded because Plaintiffs will prove, by clear and convincing evidence, that the Defendants' conduct was malicious, oppressive, and/or in reckless disregard for Plaintiffs' rights.  Kayla's actions were done maliciously and for the purpose of injuring S.A.  The Defendants' actions reflected a complete indifference for S.A.'s safety and/or rights and those actions were in the face of the perceived risk that their actions would violate federal law.  The acts by Defendants were oppressive because that damages suffered by S.A. and her

parents were through the misuse of authority and by taking advantage of S.A.'s weak position as a child under the care and control of adults in positions of authority.  Finally, nominal damages may be awarded if the jury finds for the Plaintiffs but Plaintiffs fail to prove their damages.  If nominal damages are awarded, punitive damages should also be awarded to deter similar acts by similarly situated parties in the future.

At the conclusion of the case, plaintiffs will seek their attorneys' fees and costs under the 1st Amendment claim.

DATED this 6th day of October, 2017.

BETTS, PATTERSON & MINES, P.S.


By  /s Leta E. Gorman
    Leta E. Gorman, OSB #984015
    Jeffrey M. Dore, *Pro Hac Vice*
    Betts, Patterson & Mines, P.S.
    111 SW 5th Avenue, Suite 3650
    Portland, OR 97204
    Telephone:(503) 961-6338
    Facsimile: (503) 961-6339
    E-mail:    lgorman@bpmlaw.com
    E-mail:    jdore@bpmlaw.com

    *Attorneys for Plaintiffs Achcar-Winkels*

1180719.docx/100617 1142/8395-0001

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system and the document is available for viewing and downloading from the CM/ECF system. I also certify that the foregoing document is being served electronically via the Court's CM/ECF notice system upon the following counsel of record:

**_Counsel for Defendants Kayla Nordlum_**
**_and Ashley Nordlum_**
Luke W. Reese
Garrett Hemann Robertson PC
1011 Commercial St NE
Salem, OR 97301

**_Counsel for  Suzanne Young_**
Matthew A. Levin
Markowitz Herbold PC
1211 SW 5th Ave Ste 3000
Portland, OR 97204-3730

**_Counsel for Defendant Lake Oswego_**
**_School District, et al._**
Karen M. Vickers
Mersereau Shannon LLP
111 SW Columbia St Ste 1100
Portland, OR 97201

**_Counsel for  Suzanne Young_**
Christopher B. Marks
Robert D. Scholz
MacMillan Scholz & Marks PC
900 SW 5th Ave Ste 1800
Portland, OR 97204

DATED this 6th day of October 2017.

BETTS, PATTERSON & MINES P.S.

By  _/s Leta E. Gorman_____
Leta E. Gorman, OSB #984015
Jeffrey M. Dore, _Pro Hac Vice_
Betts, Patterson & Mines, P.S.
111 SW 5th Avenue, Suite 3650
Portland, OR 97204
Telephone:      (503) 961-6338
Facsimile:      (503) 961-6339
E-mail: lgorman@bpmlaw.com
E-mail: jdore@bpmlaw.com

_Attorneys for Plaintiffs Achcar-Winkels_

Page 1 – CERTIFICATE OF SERVICE