Luke W. Reese, OSB No. 076129
lreese@ghrlawyers.com
GARRETT HEMANN ROBERTSON P.C.
1011 Commercial Street N.E.
Salem, Oregon 97301-1049
Tel: (503) 581-1501
Fax: (503) 581-5891
    Of Attorneys for Defendants
    Kayla Nordlum and Ashley Nordlum

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| TAISSA AND RAY ACHCAR-WINKELS, Individually and as Parents and Next Friends of S.A., a minor,<br><br>    Plaintiffs,<br><br>vs.<br><br>LAKE OSWEGO SCHOOL DISTRICT; an Oregon municipal corporation; HEATHER BECK, an individual; JENNIFER SCHIELE, an individual; IAN LAMONT, an individual; KAYLA NORDLUM, an individual; ASHLEY NORDLUM, an individual; SUZANNE YOUNG, an individual; and UNKNOWN STAFF, unknown individuals,<br><br>    Defendants. | No. 3:15-cv-0385-MO<br><br>**DEFENDANTS KAYLA NORDLUM AND ASHLEY NORDLUM'S TRIAL MEMORANDUM** |

Pursuant to the Court's June 9, 2017 Jury Trial Management Order, Defendants Kayla Nordlum and Ashley Nordlum (collectively, "the Nordlums") submit this Trial Memorandum.

/ / / /

/ / / /

## I. PLAINTIFFS' CLAIMS FOR TRIAL

Subsequent to the Court's May 25, 2017 Opinion and Order on the parties' Summary Judgment Motions, plaintiffs maintain the following claims against the Nordlums:

1. S.A.'s negligence claim against Kayla and Ashley Nordlum;

2. S.A.'s 42 USC § 1983 Claim asserting violation of her First Amendment rights against Kayla Nordlum;

3. S.A.'s Intentional Infliction of Emotional Distress claim against Kayla Nordlum;

4. S.A.'s False Imprisonment claim against Kayla Nordlum; and

5. A claim for punitive damages.

## II. FACTS

Plaintiffs' claims all arise from S.A.'s involvement on the Lakeridge High School Pacer Dance Team ("PDT") during the 2014-15 school year, S.A.'s freshman year. Kayla Nordlum was the Head Coach and Ashley Nordlum was the Assistant Coach. There is no dispute that both Kayla and Ashley Nordlum were acting as employees of the Lake Oswego School District at all times.

Plaintiffs allege three main "events:" 1) a team bonding weekend that occurred among the PDT members in Gearhart, Oregon, on June 28-29, 2014 (the "Gearhart Bonding Trip"); 2) a student only initiation event that took place throughout various locations in Lake Oswego on August 9, 2014 ("Initiation"); and 3) a team "boot-camp" event that occurred in Sunriver, Oregon, on August 24-28, 2014 ("Sunriver Trip").

### A. Gearhart Bonding Trip

Both Kayla and Ashley Nordlum were chaperones at the Gearhart Bonding Trip. As would be expected during a team bonding event, there were formal activities organized by the coaches and time for the team members to get to know one another. When S.A.'s parents learned of the planned trip they rented a house in Gearhart with two other families so they could drive S.A. to Gearhart and remain close for the weekend.

NORDLUM TRIAL MEMORANDUM:  
Achcar-Winkels v. Lake Oswego School District, et al.

Page - 2

One evening the athletes played a game called "ten fingers," in which PDT members discussed a variety of topics, including sexual acts. The PDT members played this game without Kayla or Ashley Nordlum's knowledge.

The morning after the Gearhart Bonding Trip the PDT members had planned to eat breakfast at a restaurant in Gearhart. At some point the location of breakfast changed to Seaside, Oregon. Kayla and Ashley Nordlum, whom were not attending breakfast but were headed home instead, dropped some of the PDT members off at the Seaside breakfast restaurant. Upon dropping the PDT members off Kayla Nordlum instructed them to coordinate rides home among themselves and the remaining adult chaperones. Shortly after Kayla and Ashley Nordlum dropped them off, the PDT members changed their mind on eating and left the restaurant. S.A. and a second teammate were riding home with their families, and they called their parents to pick them up.

### B. Initiation

On August 9, 2017 S.A. took part in a student led PDT "Initiation" which was coordinated by the PDT senior dancers. Prior to Initiation Kayla Nordlum spoke with the senior PDT members about their plans. The senior dancers told Kayla that the team was planning to spend the night at a senior dancer's house, where the dancer's mother, Kathy Fewell, would be present for all the events the entire night. The senior dancers told Kayla that the night would consist of dinner at a local Qdoba restaurant. The dancers would then go to the Fewell's house, the freshmen dancers would be dressed in silly costumes, and would complete a scavenger hunt and obstacle course at Lakeridge Junior High School. The dance team would then return to the Fewell's house for team bonding and a sleepover. Kayla had no reason to distrust the plan as it was explained by the senior dancers. Kayla also confirmed Kathy Fewell would chaperone throughout the evening. Kayla shared the plan for Initiation via email with PDT parents, including Mrs. Achcar-Winkels. Mrs. Achcar-Winkels received the information and responded with a single concern that S.A. not be driven by other teenagers. Kayla Nordlum suggested Mrs. Achcar-Winkels to contact Kathy Fewell

NORDLUM TRIAL MEMORANDUM:
Achcar-Winkels v. Lake Oswego School District, et al.

Page - 3

to discuss her driving concern, and explained that neither she nor Ashley would be present at the Initiation because they were moving. Mrs. Achcar-Winkels wished Kayla and Ashley good luck on the move.

Unbeknownst to Kayla or Ashley Nordlum, Initiation included different activities than had been shared by senior dancers. Although freshmen dancers did dress in silly costumes, including S.A. dressed as Big Bird, the freshmen dancers were blindfolded and taken to downtown Lake Oswego where they did truth-or-dare tasks assigned to them by the senior dancers. S.A. was dared to dance on top of a car.

After truth-or-dare, the dancers went to Lakeridge High School where other non-dance team students, both male and female, had congregated. At the high school, the new members were blindfolded and instructed to do the PDT "pom dance," a routine the team had been practicing to perform at events. During the pom dance, students threw water balloons at the freshmen dancers, and squirted the dancers with squirt guns filled with water and ketchup. After the pom dance, the seniors directed the freshmen PDT members to replace their costumes with plastic garbage bags. While wearing garbage bags, the freshmen wrestled on a tarp covered in maple syrup. The non-freshmen students threw powder and feathers at the freshmen PDT members.

Although neither defendant coach was aware of these events Mrs. Achcar-Winkels was observing the Initiation out of sight of the students. Before Initiation began, Mrs. Achcar-Winkels dropped S.A. off at the Fewell residence. At the time of drop off, Mrs. Achcar-Winkels learned from Kathy Fewell that the senior PDT members planned to take the freshmen to Lakeridge High School instead of the junior high as previously disclosed. Despite the fact that Mrs. Achcar-Winkels had contact information for the Nordlums, and for the High School Athletic Director, Mrs. Achcar-Winkels shared nothing of what she learned early in the evening before the dancers arrived at the high school. Rather, Mrs. Achcar-Winkels followed the students to the High School, climbed a tree to conceal her presence, and taped the event with her phone camera.

NORDLUM TRIAL MEMORANDUM:  
Achcar-Winkels v. Lake Oswego School District, et al.

Page - 4

Mrs. Achcar-Winkels did not stop Initiation, did not contact the police, did not contact Kayla or Ashley Nordlum, did not contact other PDT member parents, and did not contact anyone from the District. Rather, Mrs. Achcar-Winkels showed her husband the video she took of the Initiation and then deleted it.

From Lakeridge High the PDT members next went to the wading area in George Rogers Park. The freshmen girls were instructed to step into the wading area of the water, and then the senior dancers quizzed the freshmen with questions about their coach and dance. The team then returned to the Fewell's home where they received their PDT member t-shirts and were congratulated on becoming official members of the PDT. S.A. called her mother and asked to be picked up. Mrs. Achcar-Winkels encouraged S.A. to spend the night.

The next morning the dance team members held a car wash, which Kayla Nordlum attended. Team members gave positive reports about Initiation and shared nothing with Kayla Nordlum inconsistent with her understanding of the Initiation plan shared previously. Neither S.A. nor Mrs. Achcar-Winkels told Kayla Nordlum what occurred the night before.

On August 13, 2017, Kayla Nordlum learned from technique coach Lilly Schauffler that there was a complaint about Initiation. Kayla Nordlum was told an unidentified PDT member had complained about the events that took place during Initiation. Kayla immediately reported the anonymous complaint to Lakeridge Athletic Director Ian Lamont, directing him to Ms. Schauffler. AD Lamont subsequently met with the Mr. and Mrs. Achcar-Winkels to discuss Initiation. After meeting with the family, AD Lamont sent an email to all coaches instructing them to cease bonding events/initiations for new sports team members. Neither Kayla nor Ashley Nordlum were provided additional information about the complaints concerning Initiation before leaving for Sunriver.

### C. Sunriver Bootcamp

On August 24–28, 2014, the dance team traveled to Sunriver, Oregon. Throughout Bootcamp, neither of the Nordlums knew who complained about Initiation nor did they know the

specifics of the complaint raised. Additionally, the Nordlums continued to lack information about the actual events of Initiation, hearing only rumors of alleged conduct. The senior PDT members were upset about rumors of Initiation night, namely that they forced their teammates to drink alcohol. In an effort to understand the events that had occurred, and to put a stop to any harmful rumor or gossip, the Nordlums met with all PDT member in groups by class year to ask whether any member had concerns regarding Initiation. None of the dancers raised any concern.

While in Sunriver, as a bonding activity the PDT coaches shared, and asked the PDT members to share, an example of a challenge and a triumph from their life. Both Kayla and Ashley Nordlum gave examples from their own lives. No team member was required to participate in this activity. S.A. did not share anything. S.A. did not complain about this activity to either Kayla or Ashley Nordlum.

After the Gearhart trip, Mrs. Achcar-Winkels told Kayla Nordlum that some of the dancers had snuck out after curfew and she believed they planned to do the same in Sunriver. In an abundance of caution and to prevent this from occurring again, Kayla provided all of the dancers her cell phone number and instructed them to contact her in in the event they needed to leave their room that evening. Kayla Nordlum also decided to tape the bedroom doors, a detail she shared with parents via email. Mrs. Achcar-Winkels responded to this initial email that she believed everything Kayla was doing was correct. However, because other parents had concerns Kayla decided to discontinue the tape after one night. Kayla sent a follow up email to parents agreeing she would discontinue taping the doors. In response to Kayla Nordlum's follow up email to parents, Mrs. Achcar-Winkels again encouraged Kayla, stating "Don't let the small stuff get to you ... You ARE doing the right things" and further "Keep your head up. God gives his hardest battles to his strongest soldiers."

/ / / /

/ / / /

NORDLUM TRIAL MEMORANDUM:  
Achcar-Winkels v. Lake Oswego School District, et al.

Page - 6

### D. Post Sunriver

The PDT returned from Sunriver together and met the parents at Lakeridge High School on August 28, 2014. A PDT member parent, Christine Utech, informed Ashley Nordlum that Mrs. Achcar-Winkels had been gossiping about the senior PDT members drinking at initiation. Reasonably believing the Seniors had not been using drugs nor alcohol, and concerned about the disruption this narrative was causing the PDT, Kayla Nordlum sent Mrs. Achcar-Winkels the following email later that evening:

> Hi Taissa,
>
> Thank you for all of your help with the vans and getting everything going for us we had a blast!
>
> Ok, I need to address something that has caused a lot of havoc that I think you may know something about. The details that we hear you are saying happened at initiation are not true and I'm pretty upset that for one you would believe I would allow something like that to happen and for two that you would go to everyone and talk about it but me. It has made me feel very upset and I don't understand why you would spread something like this about my team without coming directly to me with your concern. That is one thing I ask of all of my parents.
>
> In sunriver [sic] I had one on ones with each class asking for very specific details about initiation night and the details that you supposedly think happened could be further from the truth. I even gave [S.A.] an opportunity to tell me if anything the seniors had ever done made her feel uncomfortable and she said no.
>
> My freshmen class are afraid to go into high school because they are afraid to get asked if they were the one poisoned by the PDT seniors. This is not okay!!!!!
>
> So if you would like to discuss this issue I would be more than happy to have a phone call with you or meet you, if not, please stop talk about an event you weren't present at. You are ruining what is supposed to be a good healthy team.
>
> I hope I don't hear anything more about this night from anyone else but you, but if I do it could result in some sort of suspension for [S.A.]. It isn't fair to my team and I won't have it.

/ / / /

NORDLUM TRIAL MEMORANDUM:  
Achcar-Winkels v. Lake Oswego School District, et al.

Page - 7

> I hope you understand I'm not trying to be harsh but communication about concerns needs to go to no one but me.
>
> Thanks.

At the time of her email Kayla Nordlum neither knew that S.A. was the source of the complaints regarding Initiation nor that Mrs. Achcar-Winkels had been witness to the events of Initiation. Shortly after receiving Kayla's email, Mrs. Achcar-Winkels discussed it with AD Lamont and Lakeridge High Principal Jennifer Schiele. Both AD Lamont and Principal Schiele told Kayla that the email to Mrs. Achcar-Winkels was not appropriate and that she should not discipline S.A. for her parents' concerns regarding Initiation. Kayla Nordlum called Mrs. Achcar-Winkels to apologize for the email and her misunderstanding.

Other than at practices, the only subsequent contact that Kayla Nordlum had with the Achcar-Winkels family was by text message and email. This included communicating Kayla's coaching decisions on which PDT members would be dancing in the three PDT routines. All dancers were chosen for two of the three routines and S.A. and another dancer were made alternates for the Jazz routine.

On September 22, 2014, less than a month into the school year, S.A. resigned from the dance team. Mrs. Achcar-Winkels told Kayla Nordlum S.A. quit to improve her technique through private dance lessons. Neither Kayla nor Ashley Nordlum were aware S.A. or her parents had any complaints or concerns about their coaching of the PDT until December 2014, when the District initiated its own investigation into complaints it later received. Rather, during all pertinent times that S.A. was a member of the PDT, Mrs. Achcar-Winkels always praised Kayla for her efforts as a coach.

### III.  ISSUES FOR TRIAL

**A. The Oregon Tort Claims Act Applies To Plaintiff's Tort Claims.**

The Oregon Tort Claims Act ("OTCA") applies to all tort claims against the Nordlums. Each surviving tort claim alleges the Nordlums acted as employees and agents of the Lake Oswego

School District. *See* ORS 30.265(1) ("[E]very public body is subject to civil action for its torts and those of its officers, employees and agents acting within the scope of their employment or duties ***.").

      1. <u>The District Should Be Substituted As The Only Defendant On Plaintiffs' Tort Claims.</u>

ORS 30.265(2) establishes that the sole cause of action for torts caused by the conduct of a public employee acting within the course and scope of her employment is an action under the OTCA. The only exception to this rule is where the amount of damages sought by the plaintiff exceeds the statutory cap in effect at the time. *Id.* The applicable cap in effect in this case is $667,700.00. ORS 30.272(2)(f).

While plaintiffs have not pled a specific amount of damages in their operative complaint, regardless of the amount of damages they seek, the Nordlums will be entitled to have the District substituted in their place on all tort claims. First, if plaintiffs allege an amount of damages under the applicable cap, ORS 30.265(4) applies and the District must be substituted as the defendant. Alternatively, even assuming plaintiffs allege an amount in excess of the cap, plaintiffs cannot recover any amount in excess of cap, thus making the District the only appropriate defendant. *Clarke v. OHSU*, 343 OR 581, 175 P3d 418 (2007). *Clarke* and its progeny identify the limited circumstances under which the Remedies Clause to the Oregon Constitution permits a plaintiff to recover damages in excess of the cap. *Id.* Only when the damages limitations of the OTCA result in an "emasculated remedy that is incapable of restoring the right that has been injured" will the cap be disregarded. *Id.* at 605-606. In *Ackerman v. OHSU*, the Court of Appeals identified factors a court should consider in determining whether application of the cap violates the Remedies Clause. 233 Or App 511, 227 P3d 744 (2010). The factors, in descending order of importance, are: 1) the disparity between the capped damages and the damages that the plaintiff would have recovered at common law; 2) the amount of uncompensated out-of-pocket expenses a plaintiff endures by virtue

of a capped remedy; 3) whether the capped remedy supplants a common law cause of action; 4) whether the capped remedy is consistent with a narrow construction of sovereign immunity; and 5) the degree to which the capped remedy conforms to widespread social indicators regarding just compensation of injuries. *Id.*

Unlike *Clarke* and *Ackerman* where the plaintiffs had many millions of dollars in verifiable economic damages in addition to substantial noneconomic damages, in this case plaintiffs' evidence at trial will be insufficient to prove that application of the cap would result in an emasculated remedy for plaintiffs' claimed injuries. As such, ORS 30.265(3) applies and requires that the District be the only defendant for all tort claims.

    2. The OTCA Precludes Plaintiffs' Claim For Punitive Damages Based Upon Any Of The Torts Alleged Against Kayla And Ashley Nordlum.

Because all of plaintiffs' allegations against Kayla and Ashley Nordlum arise from actions taken in the course and scope of their employment with the Lake Oswego School District, the OTCA applies to each tort claim. ORS 30.265(1). For claims governed by the OTCA, punitive damages are not available. ORS 30.269(1). Thus, plaintiffs are not entitled to, and the jury must not consider, any request for punitive damages arising from plaintiffs' tort claims.

**B. Plaintiff S.A. Cannot Prove Her Tort Claims.**

    1. Plaintiff S.A.'s Negligence Claims Against Kayla And Ashley Nordlum Will Fail Because Plaintiffs Will Be Unable To Prove Either Kayla Or Ashley Had The Requisite Prior Knowledge To Be Held Liable For The Initiation Activities.

Plaintiff S.A.'s operative complaint asserts a negligence claim against Kayla and Ashley Nordlum. Although plaintiff S.A. has yet to plead her negligence claim with specificity, defendants assume S.A.'s negligence claim stems from Kayla and Ashley Nordlum's alleged failure to intervene and prevent the Initiation activities. Assuming defendants' assumption is correct, S.A.'s burden is found in *Mosely v. Portland Sch. Dist. No 1J*, 315 Or 85, 843 P2d 415 (1992). In

NORDLUM TRIAL MEMORANDUM:  
Achcar-Winkels v. Lake Oswego School District, et al.

Page - 10

pertinent part, S.A. must prove Kayla and/or Ashley Nordlum had sufficient prior or contemporaneous knowledge of the harm causing activity to require they undertake reasonable steps to prevent the activity. *Id.* There will be no such evidence.

> 2. Plaintiffs Consented To The Alleged "Confinement" Of S.A. Thus Defeating S.A.'s False Imprisonment Claim.

Plaintiff S.A. asserts a false imprisonment claim against Kayla Nordlum as a result of Kayla placing tape on the door to S.A.'s room during the Sunriver Trip. To prevail on this claim S.A. must prove: 1) Kayla confined her; 2) the confinement was intentional; 3) S.A. was aware of the confinement; and 4) the confinement was unlawful. *Hiber v. Creditors Collection Serv. Inc.*, 154 Or App 408, 413 P2d 989 (1998). It has long been established that school employees serve in an *in loco parentis* capacity while supervising students during school activities, such as the PDT Sunriver Trip. *See e.g. Fazzolari v. Portland Sch Dist No 1J*, 3030 Or 1, 20, 734 P2d 1326 (1987) (explaining the duty of supervision owed by educators to students arises from the relationship between educators and children entrusted to their care). Consent to the confinement is a complete defense to a claim for false imprisonment. RESTATEMENT (SECOND) OF TORTS, § 892A; *Roberts v. Coleman*, 228 Or 286, 365 P2d 79 (1961).

The evidence will show: 1) the duct-tape placed on the students' doors was not placed for confinement, but rather, for the purpose of identifying any dancer leaving her room after curfew; 2) Mrs. Achcar-Winkels and S.A. were aware that Kayla placed duct-tape on the PDT member doors after curfew for one night while in Sunriver, and 3) Mrs. Achcar-Winkels and S.A. consented to S.A.'s confinement to her room, after curfew, as evidenced by Mrs. Achcar-Winkels' multiple email communications, the absence of any objection or request to leave, and S.A.'s agreement that she would not leave her assigned room after curfew.

/ / / /

/ / / /

### 3. Kayla Nordlum Did Not Intend To Inflict Severe Emotional Distress On S.A.

To prove her claim for intentional infliction of emotional distress ("IIED"), S.A. must prove Kayla Nordlum: 1) intended to inflict severe emotional distress or knew with a substantial certainty that her conduct would cause such distress; 2) engaged in outrageous conduct, *i.e.* conduct extraordinarily beyond the bounds of socially tolerable behavior; and 3) the conduct in fact caused plaintiff S.A.'s severe emotional distress. *McManus v. Auchinclos*, 271 Or App 765, 781, 353 P3d 17, (2015) (internal quotation marks and citations omitted). Harsh or intimidating words or conduct that is merely rude, boorish, tyrannical, churlish and mean is insufficient to support a claim for IIED. *Schoen v. Freightliner, LLC*, 224 Or App 613, 626-27, 199 P3d 332, 341 (2008) (citations omitted). Instead, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *House v. Hicks*, 218 Or App 348, 358, 179 P3d 730, *rev den* 345 Or 381 (2008).

Plaintiff S.A. will be unable to prove that Kayla Nordlum undertook any conduct with the purpose of causing S.A. severe emotional distress. A disagreement as to the methods or decisions of Kayla Nordlum or the means by which she coached and supervised the team is insufficient to allow this claim to proceed to the jury.

### C. Plaintiff S.A.'s First Amendment Claim Is Insufficient As A Matter Of Law.

#### 1. Plaintiff S.A.'s First Amendment Claim Is Limited To The Email That Kayla Nordlum Sent To Mrs. Achcar-Winkels On August 28, 2014.

S.A.'s First Amendment claim against Kayla Nordlum is limited to the August 28, 2014 email that Kayla sent to Mrs. Achcar-Winkels, quoted in its entirety above. (*See* Opinion and Order, Dkt. No. 165, pp 2, explaining: "There are several portions of Judge You's [Findings and Recommendations] to which no party objects. In regard to those portions, I ADOPT Judge You's F&R as my own opinion.")

NORDLUM TRIAL MEMORANDUM:  
Achcar-Winkels v. Lake Oswego School District, et al.

Page - 12

In considering summary judgment, Judge You evaluated the evidence on which S.A.'s First Amendment claim could, and could not, proceed. With regard to S.A.'s blanket allegations of a "code of silence," and Kayla Nordlum's act of requesting dance team members to not speak further about Initiation, the Court found "[w]hat is missing – at least through the time PDT returned from Sunriver – is any evidence of specific actual or threatened consequences to S.A. that might result if the instruction to cease talking about what took place at initiation were not followed." The Court ruled, "[a] group inquiry about whether the freshmen PDT dancers had any concerns about what took place at initiation, followed by a directive that the coaches 'didn't want to talk about it ever again,' accompanied by nothing more than an admonition that the dancers would be 'in trouble' for any further talk about the incident is insufficient to support a First Amendment claim for alleged retaliation against S.A." (*See* Findings & Recommendations, Dkt. No. 142, pp. 33-34). As a result of the Court's ruling, S.A.'s 42 USC § 1983 claim requires the jury only to consider whether Kayla's August 28, 2014 email to Mrs. Achcar-Winkels violated S.A.'s First Amendment rights.

2. <u>Kayla Nordlum Did Not Violate S.A.'s First Amendment Rights.</u>

In order to prevail on her First Amendment retaliation claim, S.A. must prove: 1) S.A. engaged in protected activity; 2) Kayla Nordlum took action towards S.A. that would chill a person of ordinary firmness from continuing to engage in protected activity; and 3) S.A.'s engagement in the protected activity was a substantial or motivating factor in Kayla's conduct, *i.e.*, there was a nexus between Kayla's email to Mrs. Achcar-Winkels and Kayla's intent to chill protected speech. *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F3d 858, 867 (9th Cir 2016) (citation omitted); *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F3d 755, 770 (9th Cir 2006) (citations omitted).

S.A. will need to identify the protected speech to which she believes Kayla's email was directed. Kayla's testimony will be clear that her email was intended to deter Mrs. Achcar-Winkels from spreading rumors about PDT members using illegal substances during Initiation. No reasonable juror could conclude that Kayla Nordlum was trying to chill an athlete or parent from

raising concerns. Instead, the email was intended to stop rumors by having concerns brought to the attention of the coach. The lack of any intent to chill S.A. from engaging in protected activity is evidenced by Ms. Utech's concerns about rumors, the wording of Kayla Nordlum's email, and Kayla's apology and acknowledgment that she would not suspend S.A. if her parents raised concerns. Plaintiff will be unable to prove the necessary nexus.

> 3. **S.A.'s First Amendment Claim Fails Because Under *Tinker* And Its Progeny Kayla's Email To Mrs. Achcar-Winkels Was In Response To Kayla's Reasonable Conclusion That Rumors Of PDT Member Substance Use Infringed On The Rights Of Other Students.**

The constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings, and the rights of students must be applied in light of the special characteristics of the school environment. *Morse v. Frederick*, 551 US 393, 396, 127 S Ct 2618, 168 L Ed 290 (2007). Schools have the ability to limit student speech where the school officials reasonably conclude the speech or expression would "materially and substantially disrupt the work and discipline of the school." *Tinker v. Des Moines Indep. Cmty Sch. Dist.*, 393 US 503, 513, 89 S Ct 733, 21 L Ed 2d 731 (1969). A school also has the ability to limit student speech where the school officials reasonably conclude the speech infringes on the rights of other students. *Pinard*, 467 F3d at 768 (9th Cir 2006).

The evidence in this case will reveal that Kayla's email did not infringe S.A.'s First Amendment rights because the speech Kayla was addressing with her email – Mrs. Achcar-Winkels' rumors of PDT member substance use – was speech Kayla reasonably believed would materially and substantially disrupt the work and discipline of the PDT, and would infringe the rights of the PDT members about whom the rumors pertained.

////

////

NORDLUM TRIAL MEMORANDUM:  
Achcar-Winkels v. Lake Oswego School District, et al.

Page - 14

### D. Plaintiffs Have Not Appropriately Pled For The Injunctive Remedies Sought In The Prayer Of Their Operative Complaint.

Plaintiffs' Third Amended Complaint seeks:

> [A] permanent injunction restraining and enjoining the District, Lakeridge High School, Beck, Schiele, Lamont, Nordlum, and Ashely, from failing to adequately protect S.A., and other similarly situated students, from hazing, retaliation, child abuse, bullying, and cyber bullying; [and]
>
> \*\*\*
>
> Prevent Nordlum and Ashley from serving as a volunteer, coach, teacher, or agent at any school in the District.

The equitable remedies sought in plaintiffs' operative complaint constitute relief to which plaintiffs' are not entitled. "An injunction is an extraordinary remedy, to be granted only on clear and convincing proof of irreparable harm when there is no adequate remedy at law." *Knight v. Nyara*, 240 Or App 586, 597, 248 P3d 36 (2011) (internal citations omitted). The issuance of an injunction requires an appreciable threat of continuing harm. *Id.* (Internal quotations and citations omitted).

Plaintiffs have not plead that they have suffered irreparable harm, nor that there is any threat of continuing harm posed by Kayla or Ashley Nordlum acting as agents of the District. In fact, the evidence will show that neither Kayla nor Ashley Nordlum have worked for any school District since the 2014-15 school year. For that reason, plaintiffs are not entitled to the equitable remedies requested in their prayer.

DATED this 6th day of October 2017.

GARRETT HEMANN ROBERTSON P.C.

_s/ Luke W. Reese_
Luke W. Reese
OSB No. 076129
Phone: 503-581-1501
Fax: 503-581-5891
lreese@ghrlawyers.com
Of Attorneys for Defendants
Kayla Nordlum and Ashley Nordlum

# CERTIFICATE OF SERVICE

I hereby certify that I caused to be served the foregoing **Defendants Kayla Nordlum and Ashley Nordlum's Trial Memorandum** on the date indicated below, via First-Class Mail with postage prepaid and via Electronic Filing System, to the following person(s) a true copy thereof, contained in a sealed envelope (if other than by facsimile transmission), addressed to said person(s) at their last known addresses indicated below:

LETA E. GORMAN
*OSB No. 984015*
Betts, Patterson & Mines, P.S.
111 SW 5th Avenue, Suite 3650
Portland OR  97204
*Phone: 503-761-6330*
*Fax: 503-961-6339*
*lgorman@bmplaw.com*
    Of Attorneys for Plaintiffs

JEFFREY M. DORE
*WSB No. 44951*
Betts, Patterson & Mines, P.S.
701 Pike Street, Suite 1400
Seattle WA  98101
*Phone: 206-292-9988*
*Fax: 206-343-7053*
*jdore@bpmlaw.com*
    Of Attorneys for Plaintiffs

KAREN M. VICKERS
*OSB No. 913810*
Mersereau Shannon LLP
111 SW Columbia Street, Suite 1100
Portland OR 97201-5865
*Phone: 503-226-6400*
*Fax: 503-226-0383*
*kvickers@mershanlaw.com*
    Of Attorneys for Defendant
    Lake Oswego School District, et al.

CHRISTOPHER B. MARKS
*OSB No. 833911*
ROBERT D. SCHOLZ
*OSB No. 773379*
MacMillan, Scholz & Marks, P.C.
Attorneys at Law
900 SW Fifth Avenue, Suite 1800
Portland OR  97204
*Phone: 503-224-2165*
*Fax: 503-224-0348*
*cmarks@msmlegal.com*
*rscholz@msmlegal.com*
    Of Attorneys for Suzanne Young

DATED October 6, 2017.

GARRETT HEMANN ROBERTSON P.C.

*s/ Luke W. Reese*
_____
Luke W. Reese
(OSB No. 076129)
Phone:  503-581-1501
Fax:  503-581-5891
lreese@ghrlawyers.com
Of Attorneys for Defendants
Kayla Nordlum and Ashley Nordlum

4825-6997-9985, v. 1

CERTIFICATE OF SERVICE:
Achcar-Winkels v. Lake Oswego School District, et al.